Bertha BOEING, William Edward Boeing, Jr., and Donald R. Drew, As Executors of the Estate of W. E. Boeing, Deceased, and Bertha Boeing

v.

**UNITED STATES.**

No. 396–56.

United States Court of Claims.

Dec. 3, 1958.

Lowell P. Mickelwait, Seattle, Wash., Holman, Mickelwait, Marion, Black & Perkins and Andrew M. Williams, Seattle, Wash., on the brief, for plaintiffs.

Harold S. Larsen, Washington, D. C., with whom was Charles K. Rice, Asst. Atty. Gen., James P. Garland, Baltimore, Md., on the brief, for defendant.

JONES, Chief Judge.

In this suit to recover income tax deficiencies paid, plaintiffs contend that amounts realized upon the sale of certain real estate were not ordinary income, as was determined by the Commissioner of Internal Revenue, but were gains derived from the sale of capital assets within the meaning of section 117(a) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 117(a).

The real estate sold was located in King County, Washington, north of Seattle. It was situated within areas known as Innis Arden Addition, Innis Arden Addition No. 2, Blue Ridge Addition, Westover Addition, Woodcrest Addition, and Sea Breeze Tracts.

The original plaintiffs in this action, W. E. Boeing and Bertha Boeing, were husband and wife and resided in King County, Washington, during the years in question. Because of W. E. Boeing's death in September of 1956, Bertha Boeing, William Edward Boeing, Jr., and Donald R. Drew, the executors of his estate, have been substituted as plaintiffs in his stead.

Prior to 1932 W. E. Boeing's principal business activities were directed toward the aircraft industry. He founded the Boeing Airplane Company and its predecessor; he established Boeing Air Transport, Inc.; and for a time he acted as chairman of the board of United Aircraft and Transport Corporation. Beginning in 1930, however, Mr. Boeing began to withdraw from active participation in the industry, and by 1932 he considered himself retired. Thereafter, he devoted his attention almost exclusively to his personal investments and estate. The exception occurred during World War II when he acted in an advisory capacity for the Boeing Airplane Company.

Mr. Boeing was a man of considerable wealth. His holdings were not restricted to the real estate involved in this case. At various times he owned timberlands, mining properties, stocks and bonds, thoroughbred race horses, registered cattle, and a livestock and hay producing farm. After 1934 Mr. Boeing spent little of his time in the State of Washington. Attention to his racing stable and extended cruises accounted for most of Mr. Boeing's absences. His trips were curtailed after 1944, however, because of failing health.

In 1927 Mr. Boeing's office employed Mr. D. R. Drew who in 1929 became executive assistant and financial secretary to Mr. Boeing. Thereafter Mr. Drew's position carried with it the responsibility of general supervision over all of Mr. Boeing's affairs, including the preparation and handling of correspondence, the maintaining of books of account and other records, the preparation of income tax returns, and the execution of real estate contracts and deeds. Once Mr. Boeing had established the general principles with respect to the conduct of his affairs, he then gave general authority to Mr. Drew to work out the various details.

In 1926 and 1927 Mr. Boeing began to display interest in undeveloped real estate in King County north of Seattle, Washington. Because of Seattle's noticeable expansion to the north, Mr. Boeing felt that land in that area would be a good investment. This information was brought to his attention by Mr. A. N. Graves, a real estate broker, who subsequently negotiated purchases for him. As a result, properties were acquired during the years 1926 and 1927 which eventually became known as Blue Ridge Addition, Westover Addition, Woodcrest Addition, and a portion of Sea Breeze Tracts. The Blue Ridge tract had been partially cleared at the time it was purchased by Mr. Boeing. In September 1928, Mr. Boeing entered into a contract for the improvement and construction of streets in the proposed plat of Blue Ridge, the contract also requiring, upon Mr. Boeing's request, the clearing and grubbing of lots in that area. Still later, in January 1929, a contract was entered into which provided for the construction of water mains in the proposed plat of Blue Ridge.

On April 4, 1929, Mr. Boeing organized the Blue Ridge Land Company, and

became the corporation's sole stockholder, except for qualifying shares issued to Mr. Drew and L. A. Pelton. Mr. Graves was elected vice president of the newly formed company. All of the property referred to above was conveyed by Mr. Boeing to the Blue Ridge Land Company. In exchange for this real estate, the company gave Mr. Boeing a demand note for $321,239.48 (the total cost basis of these properties on Mr. Boeing's books), with interest at 6 percent per annum. As part of the transaction, the new corporation assumed the development contracts relating to the Blue Ridge tract.

During its existence, the Blue Ridge Land Company, under the direction of Mr. Graves, completed the Blue Ridge development, and filed the plat of the Blue Ridge Addition. Additional real estate to the north of Seattle was purchased by the company. These land purchases, and also the completion of the development work on the Blue Ridge tract, were made possible by funds advanced by Mr. Boeing, for which he received demand notes from the corporation.

Following the stock market crash in October of 1929, buyers could not be found for any of the property. It was Mr. Grave's belief that construction of houses on the Blue Ridge Addition would stimulate sale of the property. He convinced Mr. Boeing of the soundness of his belief. Five large and expensive houses were thereafter built. But they remained unsold for five years.

On April 30, 1932, the Blue Ridge Land Company terminated its operations. Its real estate, including that acquired from Mr. Boeing upon its incorporation as well as that later purchased with the funds advanced by him, was transferred to Mr. Boeing. Upon its termination the company was indebted to Mr. Boeing in the amount of $960,664.69. This sum represented demand notes covering Mr. Boeing's advances for development costs and land purchases, and also office expenses and salaries for Mr. Graves and a stenographer. The real estate was transferred to Mr. Boeing at the company's cost basis in the sum of $912,642.51. To

that extent the demand notes were cancelled, and a balance of $47,904.45 was left unpaid after payment of $117.73 in cash. At the time of the transfer $164,903.31 had been expended in developing the Blue Ridge tract, exclusive of the cost basis of the five houses constructed on the property. Further efforts of Mr. Graves to sell lands from the Blue Ridge Addition proved unsuccessful, and in December 1935, he discontinued his activities with respect to Mr. Boeing's real estate holdings. At that time none of the properties had been sold.

The depression hit hard. Dividends on stock held by Mr. Boeing fell off, as did rentals from leased mining property. No market could be found for the sale of his timberland or other real estate. During the period from 1932 through 1934, Mr. Boeing considered his real estate holdings to be frozen assets. His financial resources were strained because of real estate taxes. He feared that untimely death would require his estate to sacrifice liquid assets to discharge the estate taxes. Faced with these difficulties, Mr. Boeing in 1932 decided to liquidate his so-called frozen assets.

In November of 1934, Hugh H. Russell, a real estate broker who was familiar with the real estate market in and about Seattle and knew of the Blue Ridge development in a general way, mailed to Mr. Boeing an unsolicited proposal concerning his ideas as to how the Blue Ridge property could be sold. The proposal resulted in a conference between Mr. Russell and Mr. Boeing, with Mr. Drew in attendance. Briefly stated, Mr. Russell's plan called for the construction of ten low-cost, well designed houses on the Blue Ridge tract which could be sold to people who would live in the addition and develop an interest in it.

During the discussion Mr. Boeing asked Mr. Russell what salary he would expect for carrying out the proposal. Mr. Russell replied that he preferred not to work on a salary basis because he wished to remain free to continue with his other business activities. Instead, he suggested that if his plan for selling the Blue

Ridge property was acceptable to Mr. Boeing, he wanted to be paid a retainer and commissions on sales. Following this preliminary conference, Mr. Boeing approved the proposal of Mr. Russell. It was agreed that beginning February 16, 1935, Mr. Russell would be paid a retainer of $150 monthly until commissions for the sale of the property were earned. Mr. Russell thereafter worked on a commission basis during his association with Mr. Boeing. As to the proposal for the development and sale of the Blue Ridge property, Mr. Russell was to supervise its implementation, and superintend the construction of the houses. Mr. Boeing was to pay all the development and advertising costs.

The original plan to construct ten houses on the Blue Ridge tract was modified in March 1935, at Mr. Russell's suggestion. The new scheme contemplated the construction of only three houses. Included within the plan was a budget of proposed expenditures and recommended prices for the houses. The modified proposal was approved by Mr. Boeing and Mr. Drew and was carried out under Mr. Russell's supervision.

The plan proved successful. Seven additional houses were constructed and were sold, as in the case of the first three, at prices suggested by Mr. Russell. These sales occurred in 1935 and 1936. The real estate market in the Seattle area gave indications of improvement.

In December 1935, Mr. Russell was given broad authority by Mr. Boeing to dispose of all of his real estate north of Seattle, with the exception of that property used for residential purposes by Mr. Boeing. Development and subdivision of the property placed in Mr. Russell's charge followed. Improvements made were just sufficient to meet what Mr. Russell considered to be the demands of the Seattle real estate market. All of these additional developments were approved by Mr. Boeing (findings 17 and 18).

Acting under this increased authority, Mr. Russell began to develop the Westover Addition in 1936. Ten houses were built which, because of their poor location, proved difficult to sell. This venture was unsuccessful. In December of 1940 development and platting of a 70-acre tract known as Innis Arden was begun. The work consisted of clearing land, constructing roads and water mains, and staking out lots. Because the real estate market tended to be inactive following the entry of the United States into World War II, sales of the Innis Arden lots were slow until 1943. In early 1945 Mr. Russell's proposal to develop a 150-acre tract known as Innis Arden No. 2 was initiated. Here too, improvements consisted of clearing the land, constructing roads and water mains, and staking out lots. The sale of these lots began in 1946—a time favorable for the sale of vacant lots in the north Seattle area. Most of the lots sold during the years 1946 through 1948, and which provide the basis of this litigation, were from Innis Arden No. 2.

The development of the several tracts handled by Mr. Russell followed a common procedure. Mr. Russell, based upon his study and analysis, would present to Mr. Boeing a written proposal concerning the area to be covered by each program. Contained in the proposal would be a budget of expenses. Following approval of the proposal and budget by Mr. Boeing, Mr. Russell would proceed to hire contractors to carry out the development program. Sometimes the contractors would insist that Mr. Boeing execute a written contract. But more often than not these arrangements with the contractors were oral. As work progressed and invoices were received, they passed through Mr. Russell for his approval and then were forwarded to Mr. Boeing's office, where checks were signed and issued by Mr. Boeing or by Mr. Drew in his behalf. The approved budgets were followed closely by Mr. Russell. After the particular development program was underway, neither Mr. Boeing nor Mr. Drew exercised supervision over Mr. Russell in his management of the project. Mr. Russell kept Mr. Drew informed as to progress being made. While Mr. Rus-

sell determined the prices of the individual lots, the proposals submitted to Mr. Boeing for his initial approval set forth the estimated total sales price for the entire tract. Mr. Russell was free to employ salesmen of his own choice. He determined, within the limits of the approved budget, the type and extent of advertising. The advertising appeared in Mr. Russell's name. Mr. Boeing was not mentioned, even on signs placed on the lots or tracts. Since Mr. Russell, and not Mr. Boeing, was handling negotiations with prospective buyers, the omission of Mr. Boeing's name avoided bothersome inquiries at his office or home.

Sales of real estate were negotiated through Mr. Russell's office at the tracts, Mr. Russell and his salesmen being the only contact with the prospective buyers. Mr. Russell would receive no earnest money or down payment from a prospective purchaser. Instead he would forward to Mr. Boeing's office a purchase information slip which contained the name, address, and occupation of the purchaser, the lot's description, the total price, and the agreed amount of down payment and monthly payment to be made on the balance. At Mr. Boeing's office a formal letter to the purchaser would then be prepared which was mailed, along with copies of a real estate contract form, to the purchaser. The letter instructed the buyer to sign the contracts and return them to Mr. Boeing's office, together with a check. Mr. Boeing's attorney drafted the contract form, and in each instance blanks were filled in by Mr. Boeing's office staff.

When the contracts signed by the purchaser were returned, the forms were signed in behalf of Mr. Boeing and his wife by Mr. Drew as their attorney in fact under a power of attorney. Authority was never given to Mr. Russell to sign real estate contracts in behalf of Mr. Boeing or his wife. The power of attorney was provided Mr. Drew because of the Boeings' extended absences from Seattle and their unwillingness to be subjected to troublesome details when they were present. Books of account relating to costs of development and sales were maintained in Mr. Boeing's office.

There were 124 sales of lots owned by Mr. Boeing during the year 1946, 41 in 1947, and 8 in 1948. For the 1946–1948 period, between 8 and 9% of Mr. Boeing's gross income was realized from the sale of the north King County property (finding 26). In 1946, Mr. Boeing's investment in all north King County real estate represented 10.31% of his total investments. For the same year his investment in platted real estate in that area was 2.21%. For the ensuing two years the percentages were as follows: in 1947, 9.84% for all real estate, 1.61% for platted real estate; in 1948, 11.13% for all real estate, 1.44% for platted real estate (finding 27).

The total income realized upon the sale of the King County real estate was $57,260.89 in 1946, $27,778.00 in 1947, and $33,321.09 in 1948. The Commissioner of Internal Revenue has denied treatment of these amounts as capital gains, and has assessed deficiencies on the ground that the amounts received were ordinary income.

■■ The issue before the court is thus whether the income realized by plaintiffs upon the sale of the King County real estate represented a capital gain from the sale of capital assets, or, as defendant contends, ordinary income received upon the sale of property held primarily for sale to customers in the ordinary course of a trade or business conducted by Mr. Boeing.[1] The answer to

1. Internal Revenue Code of 1939:
   "§ 117. Capital gains and losses    (a) Definitions.
   "As used in this chapter—
   "(1) Capital assets.
   "The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include—
   "(A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by

this question must turn upon the facts of the case. Rollingwood Corp. v. Commissioner, 9 Cir., 1951, 190 F.2d 263; Mauldin v. Commissioner, 10 Cir., 1952, 195 F.2d 714. We have indicated that no one factor is determinative of the issue. Garrett v. United States, 1954, 120 F. Supp. 193, 128 Ct.Cl. 100. Instead, consideration is usually directed to a number of factors, such as the extent of the development and improvement of the property; the frequency and continuity of sales; the purpose for which the property was acquired; and the activities of the taxpayer, or his agents, in promoting sales. See McConkey v. United States, 1955, 130 F.Supp. 621, 131 Ct.Cl. 690.

Development and improvement of the north King County property was extensive. Costs for the Blue Ridge Addition were incurred in clearing the land, grading of streets, installation of complete water and sewer systems, staking of lots, and construction of houses. At the time the Blue Ridge Land Company had terminated its operations in 1932, $164,903.31 had been expended in developing the Blue Ridge tract, exclusive of the costs of the houses constructed on the property. During the years 1935 to 1940, $6,407.35 was expended in advertising the Blue Ridge Addition. Additional houses were erected on the property during that period. Ten low-priced houses were built on the Westover Addition. The later development undertaken with respect to Innis Arden and Innis Arden No. 2, which consisted of clearing the land, constructing roads, and water mains, and staking of lots, carried with it a cost estimate of $69,948 (finding 25). Efforts to sell the King County real estate were continuous, beginning in 1929 and extending through the years 1946–1948. For the years we are here concerned with, 124 lots were sold in 1946, 41 in 1947, and 8 in 1948. Without question, the extent of these activities point to the probable existence of a real estate business.

The intent or purpose underlying the acquisition of the King County real estate by Mr. Boeing in 1926 and 1927 appears to have been guided by the prospects of profitable sale of the land. We cannot agree with plaintiffs that subsequent events undermined that purpose and committed Mr. Boeing to the liquidation of an unwanted investment. Counsel for plaintiffs argue that our decision permitting capital gain treatment in Gordon v. United States, Ct.Cl., 1958, 159 F. Supp. 360, at page 365, turned on the following language:

"Where sales are made by a taxpayer in the process of liquidating property received by bequest, devise, or inheritance, the taxpayer is ordinarily entitled to treat such sales as the disposition of capital assets. * * * *"

The fact that Mr. Boeing did not receive the King County real estate by "bequest, devise, or inheritance" does not weaken plaintiffs' reliance on the Gordon decision, argue counsel. That decision, we are told, essentially stands for the proposition that if a taxpayer acquires property by bequest, devise, or inheritance, or under other circumstances not of his own choosing, and thereafter takes measures reasonably necessary to liquidate the property, he will be entitled to treat its sale as the sale of a capital asset. Here, continues the argument, Mr. Boeing in 1932 received from the Blue Ridge Land Company the property he had originally transferred to it, along with the additional properties it had acquired, under conditions not of his own choosing: he was compelled to acquire the property because the company owed him approximately one million dollars, and his advances were tied up in company-owned property for which there was no market.

Our answer to this contention is that plaintiffs stress too greatly the corporate form of the Blue Ridge Land Company. Except for qualifying shares, the

the taxpayer primarily for sale to customers in the ordinary course of his

trade or business; * * * *" [26 U.S.C. (1952 ed.) § 117.]

company was wholly owned by Mr. Boeing. He did not relinquish control over the property when he transferred it to the newly-formed company in 1929. Mr. Boeing's ownership in the Blue Ridge Land Company also effectively brought within his control that additional property acquired by the corporation during its existence. The real estate development activities initiated in early 1929 by Mr. Boeing were thus continued by him under the guise of the Blue Ridge Land Company during the period April 4, 1929, through April 30, 1932. To speak of the transfer of the properties which immediately followed the demise of the corporation as involving an involuntary acquisition of the real estate by Mr. Boeing is to completely ignore the substance of what had preceded. Furthermore, to refer to the real estate transactions occurring after 1932 as part of a general liquidation of Mr. Boeing's so-called frozen assets does not preclude the existence of a trade or business, Heiner v. Mellon, 1938, 304 U.S. 271, 58 S.Ct. 926, 82 L.Ed. 1337, Home Co. v. Commissioner, 10 Cir., 1954, 212 F.2d 637, particularly where the liquidation is accompanied by extensive development and sales activity, White v. Commissioner, 5 Cir., 1949, 172 F.2d 629.

In Western & Southern Life Insurance Company v. United States, Ct.Cl., 1958, 163 F.Supp. 827, we accorded capital gain treatment to income realized from the sale of real estate that had been acquired as a result of mortgage foreclosures. The sales, which extended over a period of six months, were pursuant to a liquidation program undertaken by a corporation in the process of liquidation. There was no showing of extensive development or improvement to the land by the taxpayer in that case. Clearly, that case is distinguishable from the situation now before us.

The parties to this action seem to agree that the activities required in promoting the sale of the real estate were substantial. Beginning in September of 1928, and extending through the tax years 1946–1948, intensive efforts were made to sell the property. Initially, Mr. A. N. Graves was charged with responsibility for developing and selling the real estate. Thereafter, Mr. Russell was retained for the same purposes, and was so acting during the three-year period giving rise to plaintiffs' claim.

It is one of plaintiffs' contentions that if this court should find that the promotional activities present in this case are characteristic of a real estate business, they are to be attributed to Mr. Russell, and not Mr. Boeing. It is urged that Mr. Russell was not an employee or agent of Mr. Boeing, but was rather an independent real estate broker. That this distinction may prove significant is apparent from cases cited by plaintiffs. See Smith v. Dunn, 5 Cir., 1955, 224 F.2d 353; Fahs v. Crawford, 5 Cir., 1947, 161 F.2d 315; Garrett v. United States, supra, dissenting opinion at page 196 of 120 F.Supp., at page 106 of 128 Ct.Cl.; Gordon v. United States, supra. The facts of the instant case, however, would seem to require us to look with greater emphasis to Mr. Boeing himself, and the manner in which he conducted his affairs, in deciding the question of whether the real estate activities were those of Mr. Boeing or Mr. Russell.

It was the practice of Mr. Boeing, perhaps dictated by the magnitude of his financial and business activities, to transact his affairs through others. Thus, when Mr. Drew became executive assistant and financial secretary to Mr. Boeing in 1929, he was given general supervision of all of Mr. Boeing's affairs. While Mr. Boeing established general principles to be observed in carrying out his activities, it was Mr. Drew who was given the task of looking after the various details. Consistent with this manner of operation was the retention of Mr. Graves, who negotiated real estate purchases for Mr. Boeing during the years 1926 and 1927. Thereafter, the Blue Ridge Land Company was organized by Mr. Boeing. It can scarcely be contended that the company, in its management of the north King County real estate, was free from the general direction of Mr. Boeing. He

subscribed to 998 shares of its authorized one thousand shares of capital stock (finding 8), and periodically advanced funds to it for land purchases and development work on the Blue Ridge tract.

Mr. Boeing's later association with Mr. Russell did not work a change in this practice of operating through others. Mr. Boeing approved in each case the development projects submitted by Mr. Russell and the accompanying budgets of proposed expenditures. The expenses incurred in the projects were invoiced to Mr. Boeing and paid by his office. Books of account were maintained in Mr. Boeing's office. Where written agreements were insisted upon by contractors engaged in a development project, the contracts were entered into and signed by Mr. Boeing. Though it had been Mr. Boeing's original intention to pay Mr. Russell a salary for his services, it was at the latter's request that he was retained on a commission basis. However, it was later agreed that Mr. Russell would be paid a monthly sum in addition to the commissions earned (finding 15). Furthermore, additional control residing in Mr. Boeing was apparent from the fact that real estate contracts were prepared in his office and payments by the purchasers were directed to be made there.

We think the facts as outlined above indicate that Mr. Boeing made it a practice to transact his affairs through others, and to the extent that the activities culminating in the 1946–1948 sales were the outgrowth of a real estate business, that business is to be attributed to him and not Mr. Russell. An arrangement with a real estate broker similar to that which existed with Mr. Russell has been held to involve the taxpayer in the business of selling real estate. See Achong v. Commissioner, 9 Cir., 1957, 246 F.2d 445. Additional support for the proposition that one may conduct his business through others is found in Snell v. Commissioner, 5 Cir., 1938, 97 F.2d 891 and Welch v. Solomon, 9 Cir., 1938, 99 F.2d 41.

Upon a consideration of the various relevant factors, we are of the opinion that Mr. Boeing's activities with regard to his real estate holdings subjected that property to treatment as being held primarily for sale to customers in the ordinary course of his trade or business, and is therefore not a capital asset as defined in section 117(a) of the Internal Revenue Code of 1939.

The petition will be dismissed.

It is so ordered.

McLAUGHLIN, District Judge (sitting by designation), MADDEN and WHITAKER, Judges, concur.