## OAHU SUGAR COMPANY, Limited

v.

## The UNITED STATES.

### No. 422–58.

United States Court of Claims.

March 7, 1962.

Gilbert E. Cox and J. Russell Cades, Honolulu, Hawaii, for plaintiff. Seymour S. Mintz, Washington, D. C., Smith, Wild, Beebe & Cades, Honolulu, Hawaii, and Hogan & Hartson, Washington, D. C., were on the brief.

Benjamin H. Pester, Washington, D. C., with whom was Asst. Atty. Gen. Louis F. Oberdorfer, for defendant. James P. Garland and Lyle M. Turner, Washington, D. C., were on the brief.

JONES, Chief Judge.

In this action, plaintiff, Oahu Sugar Company, Limited, sues for refund of additional income taxes in the amount of $341,968.75, with interest, assessed and paid for the years 1950, 1951 and 1952.

Since 1897, plaintiff has operated a sugar plantation, including a raw sugar mill, on the Island of Oahu in Hawaii. The controversy is whether gains from plaintiff's sales of certain unimproved land and land with houses thereon should be taxed as capital gains or as ordinary income.[1] Plaintiff asserts the former;

---

1. 26 U.S.C. (I.R.C.1939) § 117(j) in effect provides that recognized gains on the sale of "real property used in the trade or business, held for more than 6 months which is not * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business" shall be given capital gains treatment. Since such property is not a capital asset, if the special provisions of § 117(j) are not met, the gains recognized are treated as ordinary income.

the defendant, of course, asserts the latter.

Condemnation by the United States for war purposes during World War II reduced plaintiff's acreage under sugar cultivation from 11,238 acres to 9,919. As a consequence, production of sugar per year was reduced to a quantity 12,000 tons below the minimum 60,000 tons required for profitable operations.

An adjacent sugar plantation, Honolulu Plantation Company, was so similarly affected that in 1946 a decision was made to dissolve and sell its properties. Plaintiff was considered the logical buyer, as the land was contiguous and its utilization would enable plaintiff to produce raw sugar at a lower cost per ton. C. Brewer and Company, Limited, agent for Honolulu Plantation, instituted negotiations with American Factors, Limited, acting as plaintiff's agent, for sale of the properties as a whole.

An independent report, the "Bond report," assessing the efficacy of acquiring the properties, was prepared and presented to American Factors at the request of the plaintiff. This report appraised the properties; noted improvements necessary for the profitable production of sugarcane, and suggested that certain fee simple land in the Aiea homestead area, should the decision be made not to cultivate it for sugarcane, might be more valuable than as appraised in view of the interest in homesites there.

Plaintiff was a raw sugar producer with no inclination to enter the refining business. It was known that if plaintiff were to acquire the properties, California and Hawaiian Sugar Refining Corporation, Limited (hereinafter referred to as C & H) was interested in purchasing from plaintiff the sugar refinery that Honolulu Plantation had formerly operated. The Bond report indicated that .certain employee dwellings located in the New Mill Camp, and also desired by C & H, were the "cream of Honolulu Plantation Company village dwellings" and therefore advised against accepting C & H's proposal in its entirety.

On January 1, 1947, plaintiff purchased Honolulu Plantation's physical properties for $3,750,000. On April 9, 1947, plaintiff conveyed to C & H at cost, pursuant to prior agreement, the refining mill and mill grounds. C & H also received plaintiff's promise that plaintiff would rent houses in Aiea Village (included in the assets acquired by plaintiff) to C & H's employees who operated the refinery.

Approximately 385 of the 14,631 acres acquired by plaintiff were held in fee simple—the remainder, under leasehold.

Capital outlays, occasioned by the aforementioned property acquisition and, in conjunction therewith, activities directed toward improving its entire operations, reduced plaintiff's 1946 cash surplus of $3,750,000 to a deficit of $2,-375,000 at the end of 1949, as reflected by bank borrowings.

Improvements were not confined to land use, but extended to employer-employee relations as well. The Longshoremen's Union (ILWU) objected to the "perquisites system" as a form of "economic paternalism." Perquisites were certain services provided employees free of charge, viz., housing, heat, light, water, and medical services. Union pressure in 1946 and 1947, including a strike demanding direct payment instead, culminated in plaintiff's abolishment of perquisites. Union negotiations resulted in plaintiff's decision to rent the houses which it had previously furnished free of charge. The nominal rate agreed upon was not sufficient to offset maintenance costs. Rental losses averaged about $140,000 per year for the period 1950 through 1952.

To eliminate these losses and to improve relations with employees, plaintiff, in April of 1947, began to investigate the possibility of selling these houses and of making land available for sale to employees for the construction of new homes.

Having before them requested reports on the subject from independent parties, plaintiff's directors authorized its man-

agement and American Factors, its agent, to prepare plans to subdivide for house lots about 220 acres of fee simple land adjacent the refinery mill at Aiea. This tract was located, generally, between the town of Aiea and Aiea Homesteads, two areas which were residential prior to their acquisition from Honolulu Plantation. Although it had been cultivated to sugarcane by Honolulu Plantation, as of the date of plaintiff's purchase it had been recently harvested and for the most part not replanted. Primarily because of steepness of grade, plaintiff considered it uneconomical for raising sugarcane.

Plaintiff subdivided the Aiea area into three subdivisions and entered into a joint exclusive agency agreement for the sale of the land with Samuel W. King, an independent real estate broker, and Bishop Trust Company, Limited. From 1947 through 1949, plaintiff developed 438 lots in these three subdivisions and, by the end of 1949, 366 of the lots had been sold.

In 1949, plaintiff programed the sale of houses on campsites acquired from Honolulu Plantation. Arrangements similar to those made for the unimproved tract were agreed upon by plaintiff, Mr. King, and Bishop Trust Company. Houses and their lots within Campsite or Subdivision No. 4 were ready for sale in 1950. Plans for Subdivision No. 5 were completed about November 1952.

Applicable laws and regulations required plaintiff, as subdivider, to construct streets and sidewalks, sewerage and water facilities, and to install street lights. Independent civil engineers, assisted by Mr. King and employees of Bishop Trust Company, undertook the plotting and detailed planning of the subdivisions. All appearances before the Honolulu City Planning Commission were made by one of these men.

Plaintiff's board of directors reviewed and approved the program as it progressed. American Factors coordinated the results of the engineering and sales program. The board of directors on a general basis fixed the sales price of lots and of houses with lots. They determined the order in which the various tracts were to be made available for sale, the sales methods to be employed, and the terms of the sales.

By order of the board of directors, the first choice of residential lots was given to plaintiff's employees who were allowed 30 days within which to exercise this privilege. Second preference was given to C & H employees, except that they were to have first opportunity to purchase the houses which they then occupied. Preference· rights were then given to former employees of Honolulu Plantation and to the employees of American Factors before the lots were offered to the general public. If an employee living in a house did not wish to purchase it, he was to be given an opportunity of swapping houses with any employee who wished to buy. If the latter were not possible, the employee could remain until other housing was provided.

Sales in the five subdivisions were made by Mr. King and one of his salesmen. After a sale, and the money was paid over by Bishop Trust Company who acted as escrow agent, plaintiff made a record of the sale and prepared a ledger card from which it issued monthly billings. At least one sale, a lot in Subdivision No. 5 to the Bank of Hawaii, was referred to the board of directors on April 15, 1952, for its specific approval. The board also authorized the sale of a recreation area at Aiea to the city and county of Honolulu in 1951.

Notice was given to employees of plaintiff, C & H, American Factors, and to retired employees of plaintiff and Honolulu Plantation. American Factors and plaintiff had approximately 2,500 people in their employ. Apart from this, no commercial advertising was done in connection with Aiea Subdivisions 1 and 2. The general public was apprised of the homesites by a newspaper article, which it set out in finding 32. Commercial advertising of Aiea Subdivision 3 consisted of a sign erected on the property in 1950 by Mr. King and several newspaper advertisements placed by him. No commercial advertising was done in con-

nection with the campsites, Subdivisions 4 and 5, except for notice to employees.

Finding 47 [2] sets out the number of unimproved lots and houses with lots sold to employees and to others for the years 1950, 1951, and 1952.

Plaintiff acquired certain areas in 1951 from an exchange of agricultural lands with Hawaiian Pineapple Company, Limited. Aside from Honolulu Plantation's property, no other land acquisitions were made by plaintiff between 1946 and 1952.

We find it clear, requiring no extensive discussion, that the unimproved lots and houses with lots were "real property used in the trade or business, held for more than 6 months"—the preliminary requirement to making available the long-term capital gains tax treatment provided in section 117(j) of the 1939 Code.[3] That the houses were so held is beyond reasonable doubt. The unimproved land cannot be segregated from, but was an integral part of, the transaction with Honolulu Plantation. While it had been under cultivation prior to plaintiff's acquisition, plaintiff found such use uneconomical. As that phrase is meant in the Code, the land was "real property used in the trade or business."

The question remains whether or not the gains were from "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." If this qualification of section 117(j) were applicable, the gains must be treated as ordinary income.

As thus posed, the issue is a question of fact and one not unfamiliar to this court. Several tests have evolved, none of them singularly determinative, as

2. 47. In 1950, 1951, and 1952, the number of unimproved lots and rental houses sold to employees and to others, the proceeds thereof, and the gains reported by plaintiff on such sales were as follows:

Unimproved lots sold to employees

| Year | No. | Proceeds | Gain |
|---|---|---|---|
| 1950 | — | — | — |
| 1951 | 16 | $84,850.00 | $43,767.44 |
| 1952 | 20 | 96,700.00 | 51,944.20 |

Rental units sold to employees

| Year | No. | Proceeds | Gain |
|---|---|---|---|
| 1950 | 70 | $483,225.00 | $205,784.27 |
| 1951 | 60 | 391,517.56 | 110,367.58 |
| 1952 | 55 | 377,785.00 | 182,092.52 |

Unimproved lots sold to others

| Year | No. | Proceeds | Gain |
|---|---|---|---|
| 1950 | 21 | $107,403.70 | $57,492.37 |
| 1951 | 6 | 24,250.00 | 12,173.93 |
| 1952 | 1 | 4,550.00 | 2,565.50 |

Rental units sold to others

| Year | No. | Proceeds | Gain |
|---|---|---|---|
| 1950 | 1 | $9,450.00 | $4,024.34 |
| 1951 | 33 | 221,950.00 | 62,567.01 |
| 1952 | 52 | 433,900.00 | 218,184.32 |

Aiea Park and gymnasium sold to city & county of Honolulu

| Year | | Proceeds | Gain |
|---|---|---|---|
| 1951 | | $60,000.00 | $39,942.92 |

3. See note 1, supra.

touchstones. We have considered as important the purpose for which the property was acquired; the motives for selling as subdivided acreage; the extent of the development and improvement of the property; the activities of the taxpayer, and his agents, in promoting sales, and the frequency and continuity of sales. See. e. g., Cebrian v. United States, Ct. Cl., 181 F.Supp. 412 (1960); Lazarus v. United States, 172 F.Supp. 421, 145 Ct.Cl. 541 (1959); Boeing v. United States, 168 F.Supp. 762, 144 Ct.Cl. 75 (1958).

That plaintiff acquired these lands for use in its sugar business and not for resale is clearly shown by the evidence. (See Boeing v. United States, supra, where the taxpayer acquired the property with the intention of reselling it for a profit. In Boeing, we found that the taxpayer had entered the real estate business and his gains were ordinary income.) To operate at a profit, plaintiff had to produce more sugar tonnage per year. This could be accomplished by an increase in its cultivated acreage of sugarcane. Negotiations were conducted to purchase adjacent property from Honolulu Plantation in its entirety and not for any particular part of it. The facts relevant to our application of the "purpose of original acquisition" test in two recent cases can be beneficially compared with the facts in the present case. In Lazarus, where we found the property was not held for sale to customers within the ordinary course of a business, the real estate was acquired in order to establish a farm. We reached the same conclusion in the Cebrian case. There the property was acquired to enforce the debt of an insolvent corporation.

Plaintiff's reasons for selling the property were several: to realize profits (and thus improve its worsening cash position and, of course, ultimately the sugar business itself); to eliminate losses engendered by the rental of houses to employees, and because the unimproved land was not economically suitable to the cultivation of sugarcane. A decision was made to subdivide, for, if the tract of unimproved land were sold as a single unit to real estate developers, plaintiff's employees might not have been given preference in purchasing homesites. The tendency of real estate developers to maximize profits and to develop and sell land as quickly as possible could easily have conflicted with plaintiff's efforts to divorce itself from the need to rent houses to its employees. As to the latter, every other sugar plantation in Hawaii adopted methods similar to those chosen by plaintiff to eliminate rental losses. Subdividing was also believed to be the most profitable approach.

These, then, were plaintiff's motives. We must determine whether such motives are more consistent with liquidating an asset or with embarking upon a new trade or business of selling real estate to customers. The apparent consistency of these motives with either conclusion probably stems from the fact that a taxpayer could liquidate assets *and* enter a new business to accomplish such liquidation. See Palos Verdes Corp. v. United States, 201 F.2d 256 (9th Cir.1952). It can be said, however, that plaintiff did not subdivide and sell solely to make profits. This would indicate that plaintiff was liquidating assets, but was not conducting a real estate business in doing so. In Lazarus, we found it important that the taxpayer's motive in subdividing the farmland was so that profits could be used in his motion picture business. Similarly, in Western and Southern Life Ins. Co. v. United States, 163 F.Supp. 827, 143 Ct.Cl. 460 (1958), we approved the trial commissioner's opinion which, in allowing a capital gains treatment, stressed that the purpose for selling was to achieve corporate dissolution.

Through independent contractors, plaintiff did improve the property to be sold. But, since all improvements made were required by applicable laws, ordinances, and regulations, this alone does not mean that plaintiff was in the real estate business. See Lazarus v. United States, supra, where we distinguished the Boeing case on, *inter alia*, this ground. Such requirements would not have been applicable to the sale of land as a single

tract, but plaintiff may choose the best method of liquidation and still be entitled to capital gains so long as he does not enter the real estate business. See, e. g., Chandler v. United States, 226 F.2d 403 (7th Cir.1955).

Activities of plaintiff, and of its agent, American Factors, were not extensive when compared to the normal activities of one engaged in the real estate business. Plaintiff's board of directors did initiate the program, approve the prices for which the lots were to be sold, and exercised over-all supervision. But, it must be remembered that the board did have a fiduciary duty toward plaintiff's stockholders. Necessary legal documents were prepared by Bishop Trust Company, with the assistance of a law firm. Plaintiff's monthly billings were done by machine and consumed only about two hours' work per month. Commercial advertising was minimal. Although plaintiff's notice to employees reached a sizeable group, it was consistent with the efforts to curb rental losses.

Finding 50, which shows that plaintiff's gross income from the sugar business was far greater than that from real property sales, is perhaps indicative of where the bulk of plaintiff's activities lay. The presence of a similar fact was emphasized in Gordon v. United States, 159 F.Supp. 360, 141 Ct.Cl. 883 (1958), where taxpayers' profits were given capital gains treatment. Such fact serves to distinguish Thompson v. United States, 145 F.Supp. 534, 136 Ct.Cl. 671 (1957), where we upheld the Internal Revenue Service's position of treating the profits as ordinary income.

All sales, save perhaps the one referred to the board of directors for its specific approval, were made on a commission basis by an independent broker and his salesmen. Any prospective purchaser who called at plaintiff's office was referred to this broker. We have deemed the broker's independence as a factor of consequence. See Lazarus v. United States, supra. The relationship between plaintiff and the independent broker in the case before us is not such that the activities of the broker must be said to be those of the plaintiff, as we felt was required in the Boeing case.

Frequency and continuity of sales, as can be seen from finding 47,[4] would seem a factor unfavorable to plaintiff's position. But this alone is not decisive. See Cebrian v. United States, supra. Compare Chandler v. United States, supra.

There are still other factors which have been considered in determining whether a taxpayer has entered the real estate business. It should be noted that none of the gains received upon the sale of the properties involved in this action were used to buy other real property for resale. The presence of this fact was influential in our allowing a capital gains treatment in the Gordon case and in Garrett v. United States, 120 F.Supp. 193, 128 Ct.Cl. 100 (1954). The writer's dissent in the Garrett case was limited to one of the taxpayers. It was my view that his activities in connection with the sales were such as to compel a conclusion that dealing in real estate was his primary business. Plaintiff's activities were not of this nature.

It is true, as is always true in this type of case, that either party can point to isolated facts which support his position. As to this, however, the mere fact that a taxpayer sold houses previously rented does not necessarily mean the real estate business has been entered. See 3B Mertens, Federal Income Taxation, § 12.-145 (1958).

Looking at the facts in their totality, we hold that plaintiff did not enter the business of selling real estate when liquidating these assets. We find that the properties involved were used in plaintiff's trade or business, but not held "primarily for sale to customers in the ordinary course of his trade or business." Plaintiff's gains are capital gains.

The defendant has argued that plaintiff has treated certain costs arising from

4. See note 2, supra.

its subdivision program as ordinary business expenses rather than as capital expenditures. This, as well as other contentions relating to the amount of recovery, must be reserved for a proceeding under Rule 38(c), 28 U.S.C.A.

Judgment will be entered for the plaintiff with the amount of recovery to be determined pursuant to Rule 38(c).

It is so ordered.

WHITAKER, LARAMORE and DURFEE, Judges, and REED, Justice (ret.), sitting by designation, concur.