William J. MILLER and Elizabeth
P. Miller

v.

The UNITED STATES.

No. 337–60.

United States Court of Claims.
Dec. 11, 1964.

Rehearing Denied March 12, 1965.

George H. Bowers, Jr., and William C. Baskett, Norfolk, Va., for plaintiffs.

Cynthia Holcomb, Washington, D. C., with whom was Asst. Atty. Gen. Louis F. Oberdorfer, for defendant. C. Moxley Featherston, Lyle M. Turner, Edward S. Smith, and Philip R. Miller, Washington, D. C., were on the the briefs.

Before COWEN, Chief Judge, DURFEE, DAVIS and COLLINS, Judges, and WHITAKER, Senior Judge.

WHITAKER, Senior Judge.

The question presented in this case is whether the gain derived by plaintiffs [1] in 1956, 1957, and 1958 from the sale of certain lots in a subdivision of a tract of land in Princess Anne County, Virginia, constituted ordinary income or long-term capital gain. It was ordinary income, if the property from the sale of which it was derived was "held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business" (26 U.S.C. § 1221 (1958)). The question is, was plaintiff in the real estate business.

Plaintiff, a Mennonite, was born on his father's farm on March 12, 1907, and worked on it until he was about 20 years old, when he went to Indiana, where he worked for about 18 months in a factory and later with a road contractor. Thereafter, for about 8 or 9 years, he

[1]. Mrs. Miller is a party to this action only by virtue of having filed a joint tax return with her husband. As used herein, "plaintiff" refers to William J. Miller.

worked on various farms, sometimes as a laborer for wages and sometimes as a sharecropper. But in 1937, when he was 30 years old, he was given a one-half interest in a coal mine. Two years later he bought the other one-half interest. The running of this coal mine occupied his entire time except during the summer months when he worked on a Mr. Blake's farm. In 1941 he went into the business of buying and selling turkeys and chickens in addition to running the mine. He was so engaged until the year 1948.

The city limits of Norfolk, Virginia, were expanding in the direction of plaintiff's property. In 1949, the year in which plaintiff agreed to purchase the farm, the city passed an ordinance to annex a large part of Norfolk County and Princess Anne County, which brought the city limits close to a 94-acre tract of land which plaintiff agreed to purchase in the same year from one Swartzentruber. Plaintiff made no payment at that time on the purchase price of $50,000 and no conveyance was made. It was agreed that the vendor would continue to occupy the premises until he could relocate his family.

Plaintiff made the first payment on December 27, 1951, when 40 acres were conveyed to him. Later, on September 22, 1952, an additional 36 acres were conveyed to him. On May 1, 1953, 4 acres were conveyed, and on October 1, 1953, the balance of 14 acres was conveyed. Plaintiff paid the purchase price, $20,000 in 1951, $10,000 in 1954, $20,000 in 1957, and the accrued interest in 1958.

Plaintiff says that he purchased the land for the purpose of farming it, and our commissioner so found. Under our rules the findings of our commissioner are *prima facie* correct and they are adopted by the court in the absence of exceptions thereto. However, the law casts the ultimate burden of making findings on the judges of the court, and wherever we are convinced that the weight of the testimony is contrary to the finding of the commissioner, it is our duty to substitute for the commissioner's finding what we consider to be the correct finding. In this case we think the commissioner failed to give to the testimony of plaintiff's neighbor, Hutchison, the weight to which it is entitled. Hutchison's testimony was not rebutted by plaintiff and it contradicts what plaintiff said was his purpose in purchasing the land. Hutchison's testimony, taken in conjunction with what plaintiff did immediately after he made the first payment on the land, convinces us that plaintiff did not purchase it for the purpose of farming it.

When plaintiff was considering purchasing the land, he asked his neighbor, Hutchison, if he would like to go in with him in buying it, saying that they could make $100,000 on it "right quick." Later on, after plaintiff had sold a good many of the lots, he told this same man, who had declined to join in the venture, that he had "really missed the boat." At the same time he told him that when he had sold two more lots, he would have the farm fully paid for and then he was going to borrow $50,000 and make $200,000 with it. He did not explain how he was going to do it, but, presumably, by the purchase of other land and subdividing it into lots.

As soon as the 40 acres were conveyed to him, plaintiff contracted with a surveyor to survey 20 of the acres, lay out streets and sidewalks, and divide the land into lots. After this had been done, he entered into an exclusive contract with a certain real estate agent, Bratton, to sell the lots for him. Within a month plaintiff hired another real estate agent to sell his lots as Bratton had been able to sell only one lot. Thus, plaintiff subjected himself to liability for commissions to two real estate agents for the sale of the same lots. The following year he divided the other 20 acres into lots, and a few months later he divided into lots an additional 36 acres which had been conveyed to him. The first 20 acres were known as Section 1, Kempsville Heights, the second 20 acres, Section 2, Kempsville Heights, and the 36 acres, Section 3, Kempsville Heights.

Although the city limits of Norfolk had not been extended to plaintiff's property, he nevertheless made the improvements required by ordinances of the city, such as streets, drainage facilities, etc., at a total cost of $60,186.99. This was $10,000 more than the purchase price of the land.

■ But even though it be conceded that plaintiff's purpose in agreeing to purchase the land was for the purpose of farming it, it cannot be denied that during the tax years in question he "held" the land primarily for sale to customers in the ordinary course of his business. The purpose for which held is the test rather than the purpose for which purchased.

The 94 acres were divided into 182 lots. From 1952 to 1960 plaintiff had sold a total of 135 of them. Eight sales were made in 1952, 22 in 1953, 5 in 1954, 11 in 1955, 16 in 1956, 11 in 1957, 16 in 1958, 20 in 1959, and 26 in 1960.

Plaintiff himself did not solicit purchasers for the lots but employed real estate agents to do so. Plaintiff himself determined the price at which each lot was to be sold, he signed the contracts of sale, he collected the purchase price of each lot, and executed the deeds.

Plaintiff never farmed any part of the land. He did have a vegetable garden on it, kept a cow or two to provide milk for his family, and raised hay to feed the cows on five acres. He also received a small rental income from two houses on it and from a car storage shed on it.

During the taxable years in question, plaintiff had no occupation except to tend his vegetable garden, harvest his hay, feed and milk his cows, feed his neighbor's hogs, and do what was required of him in connection with the sale of these lots. He was not a very busy man, but he had a nice income. He had abandoned his coal mine and poultry business, and the extent of his activities was as mentioned above.

In 1956 plaintiff reported income of $361.20 as interest, $1,546.06 from rents, and one-half of $15,975.96 from the sale of these lots. In 1957 he reported $2.30 income from farming, $435.89 as interest, $493.44 from rents and royalties, $600 from loan exchange, $160 from the sale of property other than these lots, and one-half of $13,668.44 from the sale of the lots. In 1958 he reported a farm income of $915.79, $179.34 from interest, $329.72 from rents and royalties, $100 from the sale of a dairy barn, and one-half of $21,772.34 income from the sale of these lots.

During the years in question, 93 percent of plaintiff's income was derived from the sale of these lots.

During the tax years in question, one would hardly say that plaintiff was very busy about anything, but, if he had any business at all, it was the business of buying property, subdividing it, and selling off the lots. As his conversation with Hutchison shows, after he paid for this tract he intended to buy another tract, subdivide it, and sell those lots. From this real estate venture, this farm laborer had derived a nice income in these tax years, and he hoped to do the same thing in the future. That he had to spend but little of his own time in doing so, would seem to be immaterial under the circumstances of this case. Nor is it material that he did not advertise the property; the lots were so located that they almost sold themselves, with some help from two real estate agents plaintiff employed. From the lots sold he was realizing an income he had never before enjoyed and, hence, he was not impelled to push for more. It was perhaps a slothful business, but a business nonetheless.

■ Whether income is a capital gain or income in the ordinary course of business of the taxpayer must be decided on the facts and circumstances of the particular case, and other cases are not very helpful. However, a few tests have been thought to be helpful, such as the purpose for which the property was acquired, the motive for selling it, the taxpayer's method of selling the land, his income from the sale of it compared with his other income, the extent of the im-

provements made to facilitate the sale of it, the frequency and continuity of sales, and the time and effort expended by taxpayer in promoting the sales in relation to his other activities. See Oahu Sugar Co. v. United States, 300 F.2d 773, 156 Ct.Cl. 546 (1962); Cebrian et al. v. United States, 181 F.Supp. 412, 149 Ct. Cl. 357 (1960); Lazarus v. United States, 172 F.Supp. 421, 145 Ct.Cl. 541 (1959); Boeing v. United States, 168 F.Supp. 762, 144 Ct.Cl. 75 (1958); McConkey v. United States, 130 F.Supp. 621, 131 Ct. Cl. 690 (1955); Fahs v. Crawford, 161 F.2d 315, 317 (5th Cir. 1947); Dillon v. Commissioner, 213 F.2d 218, 200 (8th Cir. 1954), and Curtis Co. v. Commissioner, 232 F.2d 167, 170 (3d Cir. 1956).

■■■ We have no doubt plaintiff bought the property for the purpose of subdividing it and selling the lots, from which he hoped to derive a nice profit. In order to do this he expended on improvements $10,000+ more than the purchase price. During the tax years in question he spent very little of his own time in connection with the sales, but in preparing for them he had spent considerable time, in financing the project, in having it surveyed, laid off into streets and lots, employing people to build the streets, etc., fixing the price of each lot, preparing and recording the plats, and employing real estate agents. While but little of his time was required in the tax years in question, he spent but little time on any other gainful activity.

Plaintiff places great reliance on Lazarus v. United States, 172 F.Supp. 421, 145 Ct.Cl. 541 (1959), but the facts of the two cases are substantially different. Lazarus bought the property for a farm and operated it as a farm for 5 years. He decided to sell it in order to raise needed cash in the operation of his motion picture business, in which business he had been engaged for many years. He first tried to sell the land as a single parcel and decided to subdivide it only after he found that this could not be done. As it was sold, the money was used in his motion picture business. These facts do not exist in the case at bar.

It is not worthwhile to discuss the other cases relied on by plaintiff, since each one must be decided on its own particular facts.

Plaintiffs' petition is dismissed.

DAVIS, Judge (concurring in the result):

The Trial Commissioner has found that, when plaintiff purchased the land in 1949, he intended to farm it. Under the standards we employ to review factual findings of this type by our Commissioners (Wilson v. United States, 151 Ct. Cl. 271, 273 (1960); Davis v. United States, Ct.Cl., No. 179–59, decided Feb. 14, 1964, slip op., pp. 4–5; Commerce International Co. v. United States, Ct.Cl., 338 F.2d 81 at pp. 86, 87, decided Oct. 16, 1964; Litchfield Mfg. Corp. v. United States, Ct.Cl., 338 F.2d 94, at p. 98, n. 13, decided Oct. 16, 1964) I would not overturn this express finding.[*] However, it is clear to me from the record, including among other things plaintiff's own statements, that by the time of the transactions reflected in the income of the taxable years (1956–1958), he held the property primarily for sale to customers in the ordinary course of a real estate business. He was no longer engaged in farm-

---

[*] As I read the testimony of Hutchison, on which the court relies so heavily, it is not at all clear that the witness placed the conversation with the plaintiff in 1949, the time when plaintiff first agreed to purchase the land, rather than 1951 (when the first payment was made and the first lots were conveyed to plaintiff) or in 1952. In addition, Hutchison's testimony as to the conversation was unelaborated and he admitted there was no discussion of subdividing or building, et cetera. Hutchison was the very last witness at the trial and plaintiff was the first. In these circumstances, the trial commissioner, who heard the testimony, could rightly decide that plaintiff was telling the truth when he said that he intended to farm the land when he bought it in 1949.

ing, and to a substantial extent he was actively involved in the sale of the lots which was his primary occupation. He was not merely an investor passively accepting the proceeds of his capital.