Jones, Chief Judge,
delivered the opinion of the court:
In this action, plaintiff, Oahu Sugar Company, Limited, sues for refund of additional income taxes in the amount of *548 $341,968.75, with interest, assessed and paid for the years 1950,1951, and 1952.
Since 1897, plaintiff has operated a sugar plantation, including a raw sugar mill, on the Island of Oahu in Hawaii.
The controversy is whether gains from plaintiff’s sales of certain unimproved land and land with houses thereon should be taxed as capital gains or as ordinary income.[1] Plaintiff asserts the former; the defendant, of course, asserts the latter.
Condemnation by the United States for war purposes during World War II reduced plaintiff’s acreage under sugar cultivation from 11,238 acres to 9,919. As a consequence, production of sugar per year was reduced to a quantity 12,000 tons below the minimum 60,000 tons required for profitable operations.
An adjacent sugar plantation, Honolulu Plantation Company, was so similarly affected that in 1946 a decision was made to dissolve and sell its properties. Plaintiff was considered the logical buyer, as the land was contiguous and its utilization would enable plaintiff to produce raw sugar at a lower cost per ton. C. Brewer and Company, Limited, agent for Honolulu Plantation, instituted negotiations with American Factors, Limited, acting as plaintiff’s agent, for sale of the properties as a whole.
An independent report, the “Bond report,” assessing the efficacy of acquiring the properties, was prepared and presented to American Factors at the request of the plaintiff. This report appraised the properties; noted improvements necessary for the profitable production of sugarcane, and suggested that certain fee simple land in the Aiea homestead area, should the decision be made not to cultivate it for sugarcane, might be more valuable than as appraised in view of the interest in homesites there.
Plaintiff was a raw sugar producer with no inclination to enter the refining business. It was known that if plaintiff *549 were to acquire tlie properties, California and Hawaiian Sugar Refining Corporation, Limited (hereinafter referred to as C & H) was interested in purchasing from plaintiff the sugar refinery that Honolulu Plantation had formerly operated. The Bond report indicated that certain employee dwellings located in the New Mill Camp, and also desired by C & H, were the “cream of Honolulu Plantation Company village dwellings” and therefore advised against accepting C & H’s proposal in its entirety.
On January 1, 1947, plaintiff purchased Honolulu Plantation’s physical properties for $3,750,000. On April 9,1947, plaintiff conveyed to C & H at cost, pursuant to prior agreement, the refining mill and mill grounds. C & H also received plaintiff’s promise that plaintiff would rent houses in Aiea Village (included in the assets acquired by plaintiff) to C & H’s employees who operated the refinery.
Approximately 385 of the 14,631 acres acquired by plaintiff were held in fee simple — the remainder, under leasehold.
Capital outlays, occasioned by the aforementioned property acquisition and, in conjunction therewith, activities directed toward improving its entire operations, reduced plaintiff’s 1946 cash surplus of $3,750,000 to a deficit of $2,375,000 at the end of 1949, as reflected by bank borrowings.
Improvements were not confined to land use, but extended to employer-employee relations as well. The Longshoremen’s Union (ILWU) objected to the “perquisites system” as a form of “economic paternalism.” Perquisites were certain services provided employees free of charge, viz, housing, heat, light, water, and medical services. Union pressure in 1946 and 1947, including a strike demanding direct payment instead, culminated in plaintiff’s abolishment of perquisites. Union negotiations resulted in plaintiff’s decision to rent the houses which it had previously furnished free of charge. The nominal rate agreed upon was not sufficient to offset maintenance costs. Rental losses averaged about $140,000 per year for the period 1950 through 1952.
To eliminate these losses and to improve relations with employees, plaintiff, in April of 1947, began to investigate the possibility of selling these houses and of making land *550 available for sale to employees for the construction of new homes.
Having before them requested reports on the subject from independent parties, plaintiff’s directors authorized its management and American Factors, its agent, to prepare plans to subdivide for house lots about 220 acres of fee simple land adjacent the refinery mill at Aiea. This tract was located, generally, between the town of Aiea and Aiea Homesteads, two areas which were residential prior to their acquisition from Honolulu Plantation. Although it had been cultivated to sugarcane by Honolulu Plantation, as of the date of plaintiff’s purchase it had been recently harvested and for the most part not replanted. Primarily because of steepness of grade, plaintiff considered it uneconomical for raising sugarcane.
Plaintiff subdivided the Aiea area into three subdivisions and entered into a joint exclusive agency agreement for the sale of the land with Samuel W. King, an independent real estate broker, and Bishop Trust Company, Limited. From 1947 through 1949, plaintiff developed 438 lots in these three subdivisions and, by the end of 1949, 366 of the lots had been sold.
In 1949, plaintiff programed the sale of houses on campsites acquired from Honolulu Plantation. Arrangements similar to those made for the unimproved tract were agreed upon by plaintiff, Mr. King, and Bishop Trust Company. Houses and their lots within Campsite or Subdivision No. 4 were ready for sale in 1950. Plans for Subdivision No. 5 were completed about November 1952.
Applicable laws and regulations required plaintiff, as subdivider, to construct streets and sidewalks, sewerage and water facilities, and to install street lights. Independent civil engineers, assisted by Mr. King and employees of Bishop Trust Company, undertook the plotting and detailed planning of the subdivisions. All appearances before the Honolulu City Planning Commission were made by one of these men.
Plaintiff’s board of directors reviewed and approved the program as it progressed. Aonerican Factors coordinated the results of the engineering and sales program. The *551 board of directors on a general basis fixed the sales price of lots and of houses with lots. They determined the order in which the various tracts were to be made available for sale, the sales methods to be employed, and the terms of the sales.
By order of the board of directors, the first choice of residential lots was given to plaintiff’s employees who were allowed 30 days within which to exercise this privilege. Second preference was given to C & H employees, except that they were to have first opportunity to purchase the houses which they then occupied. Preference rights were then given to former employees of Honolulu Plantation and to the employees of American Factors before the lots were offered to the general public. If an employee living in a house did not wish to purchase it, he was to be given an opportunity of swapping houses with any employee who wished to buy. If the latter were not possible, the employee could remain until other housing was provided.
Sales in the five subdivisions were made by Mr. King and one of his salesmen. After a sale, and the money was paid over by Bishop Trust Company who acted as escrow agent, plaintiff made a record of the sale and prepared a ledger card from which it issued monthly billings. At least one sale, a lot in Subdivision No. 5 to the Bank of Hawaii, was referred to the board of directors on April 15,1952, for its specific approval. The board also authorized the sale of a recreation area at Aiea to the city and county of Honolulu in 1951.
Notice was given to employees of plaintiff, C & H, American Factors, and to retired employees of plaintiff and Honolulu Plantation. American Factors and plaintiff had approximately 2,500 people in their employ. Apart from this, no commercial advertising was done in connection with Aiea Subdivisions 1 and 2. The general public was apprised of the homesites by a newspaper article, which is set out in finding 32. Commercial advertising of Aiea Subdivision 3 consisted of a sign erected on the property in 1950 by Mr. King and several newspaper advertisements placed by him. No commercial advertising was done in connection with the campsites, Subdivisions 4 and 5, except for notice to employees.
*552 Finding 47 sets out the number of unimproved lots and bouses with lots sold to employees and to others for the years 1950, 1951, and 1952.
Plaintiff acquired certain areas in 1951 from an exchange of agricultural lands with Hawaiian Pineapple Company, Limited. Aside from Honolulu Plantation’s property, no other land acquisitions were made by plaintiff between 1946 and 1952.
We find it clear, requiring no extensive discussion, that the unimproved lots and houses with lots were “real property used in the trade or business, held for more than 6 months”— the preliminary requirement to making available the long-term capital gains tax treatment provided in section 117 (j) of the 1939 Code.[2] That the houses were so held is beyond reasonable doubt. The unimproved land cannot be segregated from, but was an integral part of, the transaction with Honolulu Plantation. While it had been under cultivation prior to plaintiff’s acquisition, plaintiff found such use uneconomical. As that phrase is meant in the Code, the land was “real property used in the trade or business.”
The question remains whether or not the gains were from “property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business.” If this qualification of section 117 (j) were applicable, the gains must be treated as ordinary income.
As thus posed, the issue is a question of fact and one not unfamiliar to this court. Several tests have evolved, none of them singularly determinative, as touchstones. We have considered as important the purpose for which the property was acquired; the motives for selling as subdivided acreage; the extent of the development and improvement of the property; the activities of the taxpayer, and his agents, in promoting sales, and the frequency and continuity of sales. See, e.g., Cebrian v. United States, 149 Ct. Cl. 357, 181 F. Supp. 412 (1960); Lazarus v. United States, 145 Ct. Cl. 541, 172 F. Supp. 421 (1959); Boeing v. United States, 144 Ct. Cl. 75, 168 F. Supp. 762 (1958).
That plaintiff acquired these lands for use in its sugar business and not for resale is clearly shown by the evidence. *553 (See Boeing v. United States, supra, where the taxpayer acquired the property with the intention of reselling it for a profit. In Boeing, we found that the taxpayer had entered the real estate business and his gains were ordinary income.) To operate at a profit, plaintiff had to produce more sugar tonnage per year. This could be accomplished by an increase in its cultivated acreage of sugarcane. Negotiations were conducted to purchase adjacent property from Honolulu Plantation in its entirety and not for any particular part of it. The facts relevant to our application of the “purpose of original acquisition” test in two recent cases can be beneficially compared with the facts in the present case. In Lazarus, where we found the property was not held for sale to customers within the ordinary course of a business, the real estate was acquired in order to establish a farm. We reached the same conclusion in the Oebrian case. There the property was acquired to enforce the debt of an insolvent corporation.
Plaintiff’s reasons for selling the property were several: to realize profits (and thus improve its worsening cash position and, of course, ultimately the sugar business itself); to eliminate losses engendered by the rental of houses to employees, and because the unimproved land was not economically suitable to the cultivation of sugarcane. A decision was made to subdivide, for, if the tract of unimproved land were sold as a single unit to real estate developers, plaintiff’s employees might not have been given preference in purchasing homesites. The tendency of real estate developers to maximize profits and to develop and sell land as quickly as possible could easily have conflicted with plaintiff’s efforts to divorce itself from the need to rent houses to its employees. As to the latter, every other sugar plantation in Hawaii adopted methods similar to those chosen by plaintiff to eliminate rental losses. Subdividing was also believed to be the most profitable approach.
These, then, were plaintiff’s motives. We must determine whether such motives are more consistent with liquidating an asset or with embarking upon a new trade or business of selling real estate to customers. The apparent consistency of these motives with either conclusion probably stems from *554 the fact that a taxpayer could liquidate assets and enter a new business to accomplish such liquidation. See Palos Verdes Corp. v. United States, 201 F. 2d 256 (9th Cir. 1952). It can be said, however, that plaintiff did not subdivide and sell solely to make profits. This would indicate that plaintiff was liquidating assets, but was not conducting a real estate business in doing so. In Lazarus, we found it important that the taxpayer’s motive in subdividing the farmland was so that profits could be used in his motion picture business. Similarly, in Western and Southern Life Ins. Co. v. United States, 143 Ct. Cl. 460 (1958), we approved the trial commissioner’s opinion which, in allowing a capital gains treatment, stressed that the purpose for selling was to achieve corporate dissolution.
Through independent contractors, plaintiff did improve the property to be sold. But, since all improvements made were required by applicable laws, ordinances, and regulations, this alone does not mean that plaintiff was in the real estate business. See Lazarus v. United States, supra, where we distinguished the Boeing case on, inter alia, this ground. Such requirements would not have been applicable to the sale of land as a single tract, but plaintiff may choose the best method of liquidation and still be entitled to capital gains so long as he does not enter the real estate business. See, e.g., Chandler v. United States, 226 F. 2d 403 (7th Cir. 1955).
Activities of plaintiff, and of its agent, American Factors, were not extensive when compared to the normal activities of one engaged in the real estate business. Plaintiff’s board of directors did initiate the program, approve the prices for which the lots were to be sold, and exercised over-all supervision. But, it must be remembered that the board did have a fiduciary duty toward plaintiff’s stockholders. Necessary legal documents were prepared by Bishop Trust Company, with the assistance of a law firm. Plaintiff’s monthly billings were done by machine and consumed only about two hours’ work per month. Commercial advertising was minimal. Although plaintiff’s notice to employees reached a sizeable group, it was consistent with the efforts to curb rental losses.
*555 Finding 50, which, shows that plaintiff’s gross income from the sugar business was far greater than that from real property sales, is perhaps indicative of where the bulk of plaintiff’s activities lay. The presence of a similar fact was emphasized in Gordon v. United States, 141 Ct. Cl. 883 (1958), where taxpayers’ profits were given capital gains treatment. Such fact serves to distinguish Thompson v. United States, 136 Ct. Cl. 671 (1957), where we upheld the Internal Bevenue Service’s position of treating the profits as ordinary income.
All sales, save perhaps the one referred to the board of directors for its specific approval, were made on a commission basis by an independent broker and his salesmen. Any prospective purchaser who called at plaintiff’s office was referred to this broker. We have deemed the broker’s independence as a factor of consequence. See Lazarus v. United States, supra. The relationship between plaintiff and the independent broker in the case before us is not such that the activities of the broker must be said to be those of the plaintiff, as we felt was required in the Boeing case.
Frequency and continuity of sales, as can be seen from finding 47, would seem a factor unfavorable to plaintiff’s position. But this alone is not decisive. See Cebrian v. United States, supra. Compare Chandler v. United States, supra.
There are still other factors which have been considered in determining whether a taxpayer has entered the real estate business. It should be noted that none of the gains received upon the sale of the properties involved in this action were used to buy other real property for resale. The presence of this fact was influential in our allowing a capital gains treatment in the Gordon case and in Garrett v. United States, 128 Ct. Cl. 100 (1954). The writer’s dissent hi the Garrett case was limited to one of the taxpayers. It was my view that his activities in connection with the sales were such as to compel a conclusion that dealing in real estate was his primary business. Plaintiff’s activities were not of this nature.
It is true, as is always true in this type of case, that either party can point to isolated facts which support his position. As to this, however, the mere fact that a taxpayer sold houses *556 previously rented does not necessarily mean th.e real estate business has been entered. See 3B Mortens, Federal Income Taxation, § 12.145 (1958).
Looking at the facts in their totality, we hold that plaintiff did not enter the business of selling real estate when liquidating these assets. We find that the properties involved were used in plaintiff’s trade or business, but not held “primarily for sale to customers in the ordinary course of his trade or business.” Plaintiff’s gains are capital gains.
The defendant has argued that plaintiff has treated certain costs arising from its subdivision program as ordinary business expenses rather than as capital expenditures. This, as well as other contentions relating to the amount of recovery, must be reserved for a proceeding under Pule 38 (c).
Judgment will be entered for the plaintiff with the amount of recovery to be determined pursuant to Pule 38(c).
It is so ordered.
Peed, Justice {Bet.) sitting by designation; Hurfee, Judge; Laramoee, Judge; and Whitaker, Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Wilson Cowen, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is, and at all times referred to herein has been, a corporation organized and existing under the laws of the Territory of Hawaii. Plaintiff’s post office address is P.O. Box 3230, Honolulu, Hawaii.
2. Plaintiff brought this suit to recover the sum of $341,968.75, together with interest thereon as provided by law. The amount claimed represents alleged overpayments by plaintiff of Federal income taxes and interest thereon for the calendar years 1950,1951, and 1952.
3. Plaintiff was organized for the purpose of and is engaged in the business of operating a sugar plantation, including a raw sugar mill, on the Island of Oahu in the State of Hawaii, and has been so engaged continuously since 1897.
*557 Plaintiff’s original Articles of Association, dated February 13,1897, authorized it, among other things, to
acquire, hold, purchase and convey, either absolutely or by way of mortgage, and to lease and accept leases of real and personal property not to exceed in value at any one time the sum of Five Million Dollars; * * *.
The original Articles of Association were extensively amended and revised on March 25,1938, and, as revised and amended, read in part as follows:
(i) To buy or otherwise acquire, own, hold, use, improve, develop, mortgage, lease or take on lease, sell, convey, and in any and every other manner deal in and with and dispose of real estate, buildings and other improvements * * * to the fullest extent permitted by law, * * *.
4. For many years prior to 1947, Honolulu Plantation Company, a California corporation (hereinafter referred to as Honolulu Plantation) had been engaged in growing sugarcane and manufacturing refined sugar in the township of Aiea in the city and county of Honolulu. Prior to World War II, Honolulu Plantation was cultivating 5,252 acres to sugarcane. Because of its proximity to Pearl Harbor, the United States condemned large areas of the plantation’s sugar fields, and by 1948 its acreage had been reduced to 3,255 acres. The directors of the company felt that, as a result of this loss of their land, the plantation could no longer be a profitable enterprise, since its operation was geared to higher production. Plaintiff’s sugarcane lands adjoined those of the Honolulu Plantation.
5. In 1946, Honolulu Plantation adopted a plan of dissolution, and in accordance with this plan, C. Brewer & Company, Limited, its agent and factor, instituted negotiations with American Factors, Limited, agent and factor for plaintiff, for the sale to the plaintiff of all of the physical properties of Honolulu Plantation. Brewer & Company considered that plaintiff was the logical purchaser of the land, because plaintiff’s sugarcane land was adjacent the sugarcane land of Honolulu Plantation.
Thereupon, plaintiff employed J. D. Bond, former manager of Ewa Plantation Company, Limited (the owner of *558 a sugar plantation on Oabu), to make a survey and appraisal of the properties of Honolulu Plantation. On October 17, 1946, Mr. Bond delivered to plaintiff’s factor a comprehensive report, referred to herein as the “Bond report” and in evidence as exhibit IX. The report contained not only a complete inventory and appraisal of the properties for the purpose of advising plaintiff the value thereof as a sugar producing plantation but also included a great deal of physical 'and economic data that were designed to apprise plaintiff of the operating costs and capital improvements that would be necessary for profitable production of sugarcane. In addition, the report estimated the quantity of sugar to be produced and suggested changes which might enable plaintiff to operate the property more profitably.
In connection with the appraised value of the fee simple land for the production of sugarcane, the Bond report 'also pointed out that in view of the interest in homesites in the Aiea Homestead area, it could be argued that the value of the fee simple cane land was greater than the amount at which it was appraised in the report. The report also stated that if, because of the steepness of one 10-acre tract, cane production was discontinued on 10 acres of land to which Honolulu Plantation held fee simple title, there remained 144 acres, and if it was not used to produce sugarcane, the estimated production of sugar from the property would decrease about 800 tons per crop.
At the time the Bond report was prepared, it was known that if plaintiff acquired the Honolulu Plantation properties, the California and Hawaiian Sugar Refining Corporation, Limited, (hereinafter referred to as C & H) was interested in purchasing from plaintiff the sugar refinery that had formerly been operated by Honolulu Plantation. In that connection, the Bond report stated that C & H had indicated its desire to take practically all of the 196 employee dwellings and outhouses located in the New Mill Camp and that since these dwellings were the “cream of Honolulu Plantation Company village dwellings”, it might not be desirable for plaintiff to accede to the C & H proposal in its entirety.
6. Prior to the beginning of World War II, plaintiff had 11,238 acres of land under sugar cultivation, but because of *559 land condemnation by the United States Government during World War II and lease terminations, the land under cultivation was reduced to 9,919 acres by 1946. Plaintiff was interested in acquiring the properties of Honolulu Plantation, because the increased acreage would permit it to produce the amount of raw sugar to which the plantation as a whole was geared and would consequently enable it to produce raw sugar at a lower cost per ton. In order to operate at a profit, plaintiff needed to produce in excess of 60,000 tons of sugar per year. However, due to the loss of land, its production for the 4-year period prior to 194T averaged only 48,000 tons of sugar per year. There were no large areas of land available to plaintiff for sugarcane cultivation on the Island of Oahu, other than the Honolulu Plantation lands.
7. Negotiations between plaintiff and Honolulu Plantation were carried on between Mr. Philip Spalding, the president of C. Brewer & Company, Limited, agent for Honolulu Plantation, and Mr. Henry Alexander Walker, president of American Factors, Limited, agent for plaintiff. Negotiations were for the sale of the entire plantation properties of Honolulu Plantation and not for any part or portion thereof.
8. The agency system utilized in the sugar industry in Hawaii has been in effect for over a century. Agents such as American Factors, Limited, and C. Brewer & Company, Limited, represent many plantations. C. Brewer & Company, Limited, represents ten sugar plantations. American Factors, Limited, represents five sugar plantations and one pineapple company. At all times pertinent to this action, American Factors, Limited, as agent for plaintiff, supplied financial assistance, accounting services, technological advice and other services required under the agency agreement. The agent also supplied executive officers for plaintiff. The president, vice president, treasurer, and other officers of American Factors, Limited, served in similar capacities for plaintiff. The salaries of these officers are paid by American Factors, Limited. The compensation paid by plaintiff to its agent, American Factors, Limited, *560 under tbe agency agreement was a specified percentage of tbe gross proceeds of sale of tbe sugar, molasses, and other products of tbe plantation.
9. Tbe raw sugar produced by Hawaiian plantations in 1946 and subsequent years was shipped to the California and Hawaiian Sugar Refining Corporation, Limited. C & H is a cooperative corporation formed by Hawaiian sugar plantations, including plaintiff, and is engaged in tbe refining and marketing of sugar. However, Honolulu Plantation maintained a refinery for refining sugar consumed in Hawaii. This was the only such refinery in Hawaii. Plaintiff did not plan to go into tbe business of refining raw sugar. Therefore, during the negotiations for the acquisition of the entire Honolulu Plantation properties, plaintiff contracted to sell to C & H at cost the sugar refining machinery, equipment, and mill included in the physical assets to be purchased by plaintiff from Honolulu Plantation.
19. Under date of November 29, 1946, plaintiff offered to purchase the physical properties of Honolulu Plantation for the sum of $2,500,000, plus the sum of $850,000 for the sugar refining machinery, mill, and equipment, and an amount to be agreed upon for factory supplies. During the negotiations for the acquisition of the entire property, plaintiff received an offer dated November 19, 1946, from C & H to buy the mill and mill grounds for $850,000.
11. Honolulu Plantation accepted the offer of plaintiff on December 6,1946, subject to an increase in the purchase price for the sugar refining machinery, equipment, mill, and mill grounds from $850,000 to $1,250,000. This counter-offer was accepted by plaintiff and by C & H.
12. On January 1, 1947, plaintiff purchased from Honolulu Plantation, in consideration of $3,750,000, plus $292,-351.54 for factory supplies and materials, the physical assets of the Honolulu Plantation. The bill of sale conveying the factory supplies and materials was executed on January 27, 1947. The deed conveying the remaining assets of the Honolulu Plantation was dated March 14,1947. The consideration paid for the assets of Honolulu Plantation, other than the factory supplies and materials, was allocated in accordance *561 with, the Bond report by W. T. Vorfeld, treasurer of American Factors and plaintiff, as follows:
Land_ $163, 000
Roads, bridges and fences-35, 000
Reservoirs, pipelines, ditebes-338, 030
Wells_ 52,270
Pumping plants_ 78,490
Machinery and equipment_ 119, 675
Plantation buildings_ 130,130
Plantation cottages, water lines, electric system, fur-
niture_ 725,109
Livestock_ 4,000
Growing crops_ 748,985
Inventories-105,311
2, 500, 000
Mill and mill grounds. 1,250, 000
3,750, 000
13. Pursuant to its agreement with C & H, plaintiff conveyed to C & H on April 9, 1947, for the consideration of $1,250,000, the sugar refining mill, mill grounds, machinery, and equipment acquired from Honolulu Plantation. As a part of the contract of sale, plaintiff entered into an agreement with C & H, under the terms of which plaintiff was obligated to continue to rent houses to the employees of C & H who operated the refinery formerly owned by Honolulu Plantation. These houses were in Aiea Village and were part of the assets purchased by plaintiff from Honolulu Plantation.
The contract between plaintiff and C & H also provided that, if C & H decided to sell the mill site to someone other than a purchaser who intended to operate a sugar refinery, plaintiff would be given an opportunity to bid on the property, or, in the case of a negotiated sale, that C & H would not sell at a price lower than the price offered by plaintiff.
14. The character and uses of the lands which plaintiff acquired from Honolulu Plantation were as follows:

Fee Simple

Acres

Sugarcane_ 154. 58
Buildings and campsites. 142. 565
Pastures_ 9.05
Roads and railroads_ 13.836
Waste_ 65.475

*562
Leasehold,

Sugarcane_ 3,198.42
Buildings and campsites_ 27. 648
Pastures_ 1,376.408
Reservoirs_ 42.40
Roads and railroads_ 147. 64
Waste_ 9,453.044
Total fee simple and leasehold land- 14,630.966
15. The leased lands acquired from Honolulu Plantation were under long term leases expiring for the most part in 1965.
16. The cost of the fee simple land, leases, leasehold improvements and other improvements purchased by plaintiff from Honolulu Plantation was added to plaintiff’s other lands and fixed assets, and was carried on its books and in its balance sheet as a fixed asset along with its other fee simple lands, leaseholds and improvements. At no time has plaintiff carried on its books any portion of the lands purchased from Honolulu Plantation as real estate for sale, nor has it shown the land as included in an inventory in its published balance sheet.
17. The assets of Honolulu Plantation acquired by plaintiff were integrated into plaintiff’s sugar operations. Plaintiff’s production of raw sugar, which had averaged 48,000 tons per year for the period 1942 through 1946, increased to an average of 72,500 tons per year for the period 1947 through 1950.
18. Immediately upon acquisition of the Honolulu Plantation sugar lands, plaintiff, which was converting its transportation system for sugarcane from the use of a railroad to trucks, had to build cane-haul roads over the Honolulu Plantation lands so as to be able to transport the cane to its mill at Waipahu. Plaintiff’s trucks could not use the public highways because of their size. Plaintiff also had to rehabilitate the fields acquired from Honolulu Plantation, replowing and replanting them, as Honolulu Plantation had allowed them to deteriorate. Plaintiff also had to rebuild the irrigation system. These capital expenditures resulted in an increase of sugar yields per acre from 7 tons per acre to more than 12 tons per acre. Other capital expenditures were required for additional harvesting and transportation equip *563 ment and new cane washers at the Waipahu mill to handle the increased quantities of sugarcane to be processed into raw sugar. Finally, plaintiff had been forced to postpone much needed general work on its own fields and mill until after World War II due to shortages occasioned by the war. All of these expenditures were made in the 3-year period following the acquisition of Honolulu Plantation by plaintiff and totaled approximately $4,000,000. This sum was in addition to the $2,500,000 purchase price paid by plaintiff for the assets of Honolulu Plantation. As a result of these substantial required capital outlays, plaintiff’s cash position changed from a surplus of $3,750,000 in 1946 to a deficit as reflected by bank borrowings of $2,375,000 at the end of 1949.
19. Prior to 1947, it was the universal practice of Hawaiian sugar plantations, including plaintiff and the Honolulu Plantation, to provide to their employees free housing, heat, light, water, and medical services. These were known as perquisites. This system of providing perquisites was a distinctive feature of the sugar plantation life in Hawaii from the start of the industry in the 19th century until the abolition of the system in 1946.
20. Under the perquisite system, living quarters for single employees and homes for married employees were furnished in houses built by plaintiff. Plaintiff maintained a staff to build houses and to maintain them. These houses were constructed in groups known as campsites and were usually close to the sugar mill or center of operations of the plantation. Some campsites, however, were farther out in the fields. Plaintiff’s main campsite was at its mill and is known as the township of Waipahu. This is in the center of plaintiff’s operations.
21. Labor unionism in Hawaii had become militant after the end of World War II. Labor leaders publicly condemned the perquisite system of Hawaiian sugar plantations as a form of “economic paternalism” and claimed that this system tended to ingratiate the employer with the employee. The unions adopted a policy of seeking to include the economic value of heat, light, quarters and other services in take-home pay. The sugar workers employed by plaintiff and by other sugar plantations on the Island of Oahu *564 engaged in a strike which- lasted from September 1 to November 19,1946. When the strike ended on November 19, 1946, it was with the understanding that any settlement would be effective as of that date. In April 1947, effective as of November 19, 1946, the longstanding system of perquisites, which was common to all sugar plantations engaged in business in Hawaii, was abolished. The value of the perquisites was converted into minimum net guaranteed wages expressed in terms of cents per hour. In 1947, but retroactive to November 19, 1946, sugar plantation employees were required to pay rent for their plantation-owned living quarters and to pay for utilities, etc. It was optional with the employee as to whether or not he would join the medical plan. The contracts between the sugar plantations on Oahu and their respective locals and units of the International Longshoremen’s and Warehousemen’s Union were executed upon the completion of bargaining in 1947, effective November 19,1946.
22. Subsequent to November 19, 1946, the employees of plaintiff and other plantations were required to pay rent for their living quarters. The amount of such rentals was set by negotiations with the union and was made a part of the collective bargaining agreement. During the calendar years 1947 through 1952, the rents collected from plaintiff’s employees were as follows:

Number of homes rented

Number of Tear employees Waipahu Aiea Total

1947- 1,619 1,061 361 1,422
1948- 1,685 1,088 385 1,453
1949- 1,538 1,061 379 1,440
1950- 1,541 1, 054 360 1,414
1951- 1,469 1,047 348 1,395
1952- 1,404 1,002 239 1,241

Rents collected,

Tear Waipahu Aiea Total

1947-$258,289 $87,800 $346,169
1948- 261, 606 94, 302 355, 908
1949- 219,117 78,277 297, 394
1950- 215,648 73, 662 289,310
1951- 192, 543 63, 998 256, 541
1952- 202,784 48, 373 251,157
*565 These negotiated rentals were relatively nominal and far lower than would have been charged to tenants other than employees.
23.Plaintiff suffered losses on the renting of houses to employees from 1947 through 1949. In the taxable years involved in this action, 1950 through 1952, it sustained the following losses on such rentals:
1950_$97,117.17
1951_ 143,303. 09
1952_ 183,224.19
24. Immediately after the 1946 strike and the abolishment of the perquisite system, all sugar plantations in Hawaii instituted a program of selling rental houses to their employees and of making land available for sale to employees for the construction of new homes thereon by them. This program was due not only to the losses accruing to the plantations from the renting of houses to employees but was also due to a desire on the part of the plantations to develop better employer-employee relations. The employees themselves were not satisfied with the rental system because they were paying rent for the first time and they wanted better maintenance on their houses. The plantations also thought their employees would be happier and provide a more stable labor force if they owned their own homes and the campsite stigma was eliminated. Plaintiff began such a program in 1947.
25. At the April 11, 1947, meeting of plaintiff’s board of directors, C. T. Bailey of the Land Department of American Factors explained to the directors the possibility of selling an area of the fee simple land purchased from Honolulu Plantation adjacent the refinery and the mill camp at Aiea for house lots. After considerable discussion, the plaintiff’s manager and American Factors were authorized to study the project and prepare and submit plans to the directors at a future meeting. At the same meeting, the manager of Oahu Plantation, Mr. Hans L’Orange, informed the board of directors that the Parks Board of the city and county of Honolulu had expressed to him an interest in purchasing the gymnasium and recreation field at Aiea. This property was part of the assets of the Honolulu Plantation acquired by plaintiff. It was the sense of the meeting that this matter *566 should be studied together with the project of selling house lots in the vicinity.
26. At plaintiff’s request, Samuel W. King, an independent real estate broker, and Bishop Trust Company, Limited, through its real estate department, both of which operated general real estate offices in Honolulu, submitted a written offer on May 17, 1947, to prepare for plaintiff a report and an analysis of the sale in a subdivision of small lots, or as acreage, or as a whole, a tract of 220.62 acres of land, in Aiea Heights. The tract was part of the property which plaintiff had acquired from Honolulu Plantation and was located generally between the town of Aiea and Aiea Homesteads, two areas which were residential prior to the date plaintiff acquired the property. The land to be covered by the King-Bishop report was not occupied by plantation houses; it had formerly been cultivated to sugarcane by Honolulu Plantation. As of January 1, 1947, it had been recently harvested and not replanted, except for a small area that was used for raising seed cane. Plaintiff did not consider it economical for raising sugarcane primarily because of the steepness of the grade.
27. On May 27, 1947, plaintiff accepted the offer of Mr. King and the Bishop Trust Company to prepare a report and analysis. The terms of the agreement provided that the latter would have a joint exclusive agency for the sale of land. If sold as a whole or in acreage lots, the agent’s commission would be 5 percent; if sold as a subdivision, the commission would be 7% percent, out of which 5 percent would be paid to any outside broker making a sale. Mr. King 'and the Bishop Trust Company were each to be paid the sum of $1,000 for the report and analysis.
28. On July 15,1947, plaintiff retained James B. Mann, an independent civil engineer, to survey the land and to perform other engineering services 'that would be needed in connection with the proposed subdivision. He submitted a preliminary estimate for the cost of improving three subdivisions on August 19, 1947, and the King-Bishop report was made on September 10,1947. It was later supplemented on October 10, 1947. The King-Bishop report stated that *567 there was 'a splendid view of the coastline from the tract, that it was well suited for a residential subdivision, was conveniently located for persons working in Honolulu, and was a particularly advantageous location for those working at Pearl Harbor, Hickam Field, Fort Shafter, Waipahu, and Ewa.
29. The two King-Bishop reports were presented at a meeting of plaintiff’s board of directors on October 27, 1947. After some discussion, the board of directors decided that it would be advantageous to plaintiff to subdivide the area and to sell it in comparatively small lots. Accordingly, the board authorized the management and American Factors to prepare detailed plans and estimates with a view to subdividing the property in question. Necessary expenditures for these additional studies were also approved.
30. Plaintiff subdivided vacant lands in the Aiea area into three subdivisions, which are identified on the map, in evidence as plaintiff’s exhibit 1, as Aiea Subdivision No. 1, Aiea Subdivision No. 2, and Halawa Subdivision No. 3. From 1947 through 1949, plaintiff developed 438 lots in these three subdivisions and by the end of 1949, 366 of the lots had been sold. Plaintiff’s costs of development amounted to $631,353.72 and total sales during the same period amounted to $1,519,758.50.
31. In 1949 plaintiff began making plans for the sale to employees of homes which had been rented to them on the campsites acquired from Honolulu Plantation. Arrangements similar to those made for the unimproved land were entered into with Mr. King and Bishop Trust Company, Limited, for the sale of the houses and lots at the campsites. Reports and analyses were first received in 1950, and the engineering work on the first campsite, identified on plaintiff’s exhibit 1 as Campsite or Subdivision No. 4, was completed in 1950. Plans for the second campsite, identified on plaintiff’s exhibit 1 as Campsite or Subdivision No. 5, were completed about November 1952.
32. Plaintiff’s activities with respect to the sale of the vacant lots in the first three subdivisions were described in a local Honolulu newspaper as follows:
*568 Excerpts From Honolulu Advertiser op SuNday, Sept. 18, 1948
200 ACRES OP CANE LAND GO TO HOUSING
By Hugh Lytle
A large Hawaiian sugar plantation actually has given up more than 200 acres of its choice cane land to be used for fee simple homesteads for its employees. The plantation was the Oahu Sugar Co., which set aside its fee simple holdings below Aiea Homesteads, chiefly for the benefit of its employees. After giving employees of the plantation of O & H Sugar Befining Corp., and of American Factors priority in purchase, the remainder of the lots were offered to the general public at prices described as being below the general market value.
Land hunger in Hawaii never can be satisfied completely. There are too many people, not enough land, and the people are becoming more numerous every year. Some land has been added to the supply by dredging, but some is being taken away steadily, too, by erosion, which carved out the mountain ranges and sent the soil into the lowlands and into the sea.
But at least some of the edge of the appetite for land is being taken off by the creation of new subdivisions in increasing numbers in many parts of Oahu. The Aiea Highlands Tract, subdivided by the Oahu Sugar Co., is an example.
There are pleasant areas on the windward side, where those who covet land in fee simple may acquire parcels— at a price. * * *
Frequently the cost is so high that many would-be purchasers have given up hope of owning land outright. * * *
But land hunger still exists. The extent of hunger was shown by the enthusiastic response to one of the most recent offerings, the 220 acre tract mauka of Aiea Mill, rising gently to meet the lower bomidary of the Aiea Homesteads. The fertile Aiea slopes provide some of the finest prospects in the islands. Until recently the slope was in cane. Now it is in process of grading for streets and excavation for underground utilities. There will be no telephone or power poles to mar the view from the hills.
The Subdivision was made possible when Oahu Sugar Co. bought the entire holdings of the Honolulu Plantation Co. in January 1947. The purchases included leases of great tracts of cane lands, plus a relatively *569 small amount held in fee simple. The Aiea Mill was turned over to C & H Refining Corp. which manufactures refined sugar for Hawaii. Activities of Oahu Sugar Co. continued to center at the Waipahu mill.
The fee simple tract on Aiea lies on two ridges. * * *
From the vantage point in the hills above Aiea Village may be seen lands owned by a dozen estates but leased out and producing cane. * * *
Only on the hills above Aiea Mill was there an area of fee simple land, conveniently located for subdivision and relatively cheap — as Hawaiian land prices go. The Oahu Sugar Co. owned it, outright.
American Factors, Inc. is the agency for Oahu Sugar Co. George W. Sumner, Vice President, and Charles T. Bailey, manager of the Agency Land Dept., began a study of the problem of turning cane land into subdivision. Samuel W. King and H. E. Tuttle of Bishop Trust Co. acting as co-agents, carried the study to completion and acted as brokers after James B. Mann drew up the engineering plans.
The first unit of the 220 acres to be subdivided lay on the slope mauka of Aiea Mill. It was divided into 231 lots, all designated as Class AA. Of these all but eight were disposed of this week. Another section mauka of the mill, but in the valley was divided into 118 Class A lots and these were disposed speedily. A third area just below the Aiea Naval Hospital on an adjoining ridge, will be the last unit in the project. Bids for grading and street work there will be called for early next year, perhaps, and they probably will be disposed of as quickly as were the others.
Lots sold thus far have been turned over at prices ranging from 200 to 490 a square foot. The greater the area, due to the sloping contour, the lower the price per square foot should be, company officials decided * * *.
The subdivision was intended for working men. There are few restrictions except that houses must be built of all new material and must contain at least 800 square feet of floor space. Use of second hand, termite-infested lumber is forbidden. Surplus army buildings and quonset huts also will be excluded under the terms of the sale.
There will be ample water supply insured by the drilling of two new wells in the Aiea gulch * * *.
Some 25 percent of the lots in the first tract to be opened were bought by the employees of the Oahu Sugar Co. The remaining 75 percent was snapped up *570 by others who wanted to live in a neighborhood convenient to Pearl Harbor or to Honolulu. When the second tract was opened with smaller lots, about one half of them were bought by employees. Lots in third tract have not yet been put on sale.
This may be the first time on Oahu that a plantation has offered to sell its employees their own homesites in fee simple. Certainly it is the first time that residents of Honolulu, in large numbers, have sought to buy house lots in what, after all, might be called a plantation village.
33. Plaintiff was required to apply to the City Planning Commission of the city and county of Honolulu and to the local agencies for approval of the subdivision plans before it could proceed with their development and sale. The applicable laws and ordinances and the regulations of various governmental agencies required the plaintiff, as subdivider, to construct streets and sidewalks, sewerage and water facilities, and water reservoirs and to install street lights. Rezoning of the land was also necessary. The civil engineers, assisted by Mr. King and employees of Bishop Trust, undertook the plotting and detailed planning of the subdivisions, and all appearances before the City Planning Commission were made by one of these men. Construction work required in the subdivisions was done by independent contractors. The contracts for construction work in the subdivisions were reviewed and approved by the plaintiff’s board of directors. During the course of the work on the subdivisions, Mr. Kong and Mr. Tuttle of Bishop Trust Company made progress reports to the board of directors. It was determined by the board of directors that telephone and electric utilities installed in connection with the subdivisions should 'be placed underground, and that various deed restrictions should be adopted for the subdivisions. The Land Department of American Factors coordinated the results of the engineering and the sales program. In the case of the campsites (Aiea Subdivisions 4 and 5), plaintiff was required to move buildings, construct inside toilets and bathrooms, install kitchen sinks, and widen existing roads. A few of the lots in Subdivisions 4 and 5 were unimproved. Some concern was expressed at a meeting of the plaintiff’s ‘board of directors over the sale of rental properties in the campsites and the *571 resulting shortage of rental properties. Although the plaintiff’s management did give consideration to the possibility of building one or two houses for rent on lots in Aiea Subdivision 3, plaintiff built no houses on the vacant lands.
34. The sale price of lots and of houses with lots was fixed on a general basis by plaintiff’s board of directors. The board was aided in this determination by the appraisals set out in the King-Bishop Trust Company report. Individual adjustments designed to take into account varying topographical features were worked out by Messrs. King and Tuttle and approved by American Factors. The union representing plaintiff’s employees suggested to plaintiff’s management that houses in Aiea Subdivision 4 (Aiea New Mill Camp) be sold to plaintiff’s employees below the current market value. The company explained to the union that the houses were assets belonging to the stockholders and must be sold at a reasonable price, and further that it would not be proper to benefit the relatively small number of plantation employees who purchased the houses without offering the same opportunity to all employees. Lots and houses with lots were offered to the general public at the same prices they were offered to employees.
The board of directors also determined the order in which the various tracts were to be made available for sale, the sales methods to be employed, the terms of sale, and the preference to be given plaintiff’s employees and employees of C & H in choosing residential lots. The plaintiff did not place all of the subdivisions on the market at the same time, because it was not feasible to prepare them for sale simultaneously and because the plaintiff did not want to depress the market.
35. Sales to the general public were made for cash or by deed and mortgage on the basis of a 20-percent down-payment with payments of 1 percent per month of the initial balance, interest to be charged at the rate of 5 percent payable monthly. Sales to employees were made for cash or were handled by a provisional sales agreement which required a 10-percent downpayment at the time of signing of the contract. The remaining 10 percent of the normal downpayment was payable and the regular monthly pay *572 ments commenced within 30 days of the signing of the contract by the plaintiff for the installation of roads and improvements. Mr. King and Bishop Trust were authorized as co-agents to execute these provisional sales agreements in plaintiff’s behalf.
36. By order of plaintiff’s board of directors, the first choice of residential lots was given to plaintiff’s employees who were allowed 30 days after' the first offer of sale within which to exercise their priority rights. The board’s order also provided that the second preference should be given to employees of C & H. Preference purchase rights were then given to former employees of Honolulu Plantation and to employees of American Factors before the lots were offered for sale to the general public.
37. When it was determined by plaintiff’s board of directors that a specific tract should be made available for sale, plaintiff notified its employees by letter, by notice on company bulletin boards, by articles in the company’s monthly progress reports, and in the plantation newspaper that the houses and land would be offered first to employees of plaintiff and then to employees of C & H. Some of plaintiff’s employees were notified by the mill superintendent. In at least one instance, there was a meeting of plaintiff’s employees at the plantation clubhouse apparently organized for the purpose of acquainting the employees with the location and description of the lots. The record does not reveal whether this meeting was organized or set up by the plaintiff or by the real estate agents.
In the case of Aiea Subdivisions 4 and 5 (the campsites), plaintiff’s employees were notified by the same media that employees who did not wish to buy the houses they were living in, would be given an opportunity of swapping homes with other employees who wished to buy, and that where swapping was not possible, employees would be allowed to stay in their houses, paying the regular rent until they could be housed elsewhere.
38. In plaintiff’s agreement with C & H to furnish housing to employees of that company, it was further provided that in the event of the sale, C & H employees would be given the first opportunity to purchase the houses which *573 they then occupied. Plaintiff notified the employees of C & H of the availability of lots and of tlieir preference rights of purchase. The Land Department of American Factors sent notices to the employees of American Factors and to employees of its affiliates informing them of the availability of lots and of the preference to be given them. Notices were also posted on the bulletin boards at American Factors.
39. Except for the notices given to employees of plaintiff and of C & H, to employees of American Factors and its affiliates, and to retired employees of plaintiff and the Honolulu Plantation, no commercial subdivision advertising was done in connection with Aiea Subdivisions 1 and 2. In 1952 the plaintiff had 1,389 employees, and American Factors had approximately 1,200 employees.
The general public was made aware of the extent to which the lots were available for purchase by the newspaper article set out in finding 32. By the time Aiea Subdivision 3 was made available for sale, nearly all employees who wished to do so had purchased lots in Aiea Subdivisions 1 and 2. Commercial advertising of Aiea Subdivision 3 consisted of a sign erected on the property in 1950 by Mr. King and several newspaper advertisements placed by him.
Except for the notifications given to employees as previously described, there was no commercial advertising in connection with the campsites, Subdivisions 4 and 5. Employees of plaintiff 'and C & H then living in the houses offered for sale in these subdivisions were given first preference to buy the houses.
40. All sales of the lots and houses with lots were made by Mr. King and one of his employee-salesmen, either from an automobile parked on the tract to be sold or from an office which the salesman maintained on the property owned by another large land-owner in the area.
As shown by the minutes of the meeting of plaintiff’s board of directors of April 15, 1952, at least one sale was referred to the board for its specific approval. On that day, the board voted to sell a lot in Subdivision No. 5 to the Bank of Hawaii for $30,000,
*574 Bishop Trust Company, Limited, with the assistance of a local law firm, prepared all of the legal documents that were required for the consummation of each sale and acted as escrow agent for plaintiff. Prospective purchasers who called at plaintiff’s office were referred to Mr. King or to the salesman employed by him.
41. After a sale was consummated and the money paid to the plaintiff by Bishop Trust Company, Limited, plaintiff made a record of the sale and set a ledger card from which plaintiff issued monthly billings. The billings were done by machine and consumed approximately 2 hours’ work each month.
On March 15, 1951, the notes receivable secured by mortgages on Aiea Subdivisions 1 and 2, which were to become due on May 1, 1951, were extended by the plaintiff’s board of directors for a period of one year with the same provision for monthly payments and interest rate.
42. At the July 25, 1949, meeting of the plaintiff’s board of directors, the real estate agents and plaintiff’s management were authorized to negotiate the sale of the recreation area and gymnasium at Aiea. This land, with the improvements thereon, had been appraised by the real estate agents at $57,670. In was finally sold to the city and county of Honolulu in 1951 for $60,000. The recreation area and gymnasium at Aiea comprise the area marked “(6) Gymnasium” on the map in evidence as plaintiff’s exhibit 1.
43. As stated in finding 13, plaintiff agreed with C & H, at the time the latter purchased the sugar refinery, to provide rental housing for the employees of C & H. Since plaintiff did not desire to furnish such housing to C & H employees indefinitely, plaintiff wrote C & H on March 1,1950, offering to sell it approximately 100 of the houses then rented to its employees. Again on September 11, 1952, plaintiff offered to sell C & H 38 more of the same group of houses. Both offers were rejected by C & H primarily because its buyer, Sugar Plantations of Hawaii, had adopted the policy of no longer providing rental housing for employees. Plaintiff took the position that the rejection of the offers by C & H constituted a termination of plaintiff’s agreement to furnish rental quarters thereafter to the employees of C & H, and the *575 houses were subsequently sold by plaintiff as individual units in the subdivisions in which they were located.
44. Plaintiff acquired no lands between 1946 and 1952 except the lands of the Honolulu Plantation involved herein and certain areas which plaintiff acquired in 1951 as the result of an exchange of agricultural lands with the Hawaiian Pineapple Company, Limited.
45. While the evidence is not sufficient to establish which was the primary or dominant factor, the following factors influenced plaintiff in its decision to sell the lots and the houses included within the five subdivisions described in preceding findings:
(a) Immediately after acquiring the Honolulu Plantation properties, plaintiff was faced with the necessity of making large capital expenditures for the purposes which have been described in finding 18. These expenditures required extensive loans from banks and were made over a 3-year period.
(b) On the basis of the estimates contained in the King-Bishop reports, plaintiff believed that it would realize a substantial profit from the sale of the land and thus offset some of the expenditures it would be required to make for improvements and new equipment and the losses which it would incur in the rentals and maintenance of houses for employees. In November 1948, the treasurer of plaintiff reported that plaintiff’s operations during that year would result in a net loss of $76,000, but that the inclusion of the estimated profit on the sale of the house lots would result in a total net profit for the year of $355,000, after taxes.
(c) Because of the combination of low rentals and high maintenance costs, plaintiff realized that a continuation of a program of renting houses to its employees would result in substantial cash losses each year. The extent of such losses for the years in suit are shown in finding 23. Each time that an employee bought a lot from plaintiff and erected a home thereon, there was a reduction in the rental units which plaintiff was renting and maintaining at a loss. Also, plaintiff’s directors believed that the sale of the lots, and later the houses in the campsites, to employees would improve employer-employee relations.
(d) Plaintiff considered that 150 acres of the approxi *576 mately 220 acres of land in Subdivisions 1,2, and 3, were only moderately good and possibly not economical for the production of sugarcane, primarily because of the steepness of the grade. The remainder of the 220 acres in the three subdivisions was wasteland.
46. Plaintiff decided to subdivide the land and sell the property in individual lots rather than as a single unit or in larger tracts because:
(a) With respect to Subdivisions 1,2, and 3, the minimum estimates set forth in the King-Bishop reports indicated a net advantage after taxes in favor of a subdivision plan, as opposed to the sale of the land as a single unit or in large parcels, of approximately $300,000. The reports also reflected that a similar advantage in favor of the subdivision plan existed with respect to the sale of the campsites developed as Subdivisions 4 and 5.
(b) Plaintiff was concerned that if the land was sold as a single unit or in large parcels to real estate developers, plaintiff’s employees might not be given first preference in purchasing homesites.
(c) Plaintiff’s directors believed that the natural tendency of real estate developers to maximize profits and to develop and dispose of the property as quickly as possible might conflict with plaintiff’s objective to get out of the losing business of renting houses to employees. The evidence does not establish that plaintiff intended to or that it did sell the lots and houses to employees at lower prices than to the general public. However, plaintiff’s desire to avoid continuing losses from the rental of houses was equally as strong as its desire to realize a profit from the disposition of the land.
47. In 1950,1951, and 1952, the number of unimproved lots and rental houses sold to employees and to others, the proceeds thereof, and the gains reported by plaintiff on such sales were as follows:

Unimproved lots sold to employees

No. Proceeds Gain Tear

1950 ,
$84, 850. 00 $43, 767.44 1951 H-05
96,700. 00 51,944.20 1952 to 0

*577
Rental units sold to employees

Year No. Proceeds Gain

1950_70 $483,225.00 $205,784.27
1951_ 60 391, 517.56 110,367. 58
1952_ 55 377,785.00 182,092.52

Unimproved lots sold to others

Year No. Proceeds Gain

1950_21 $107,403. 70 $57,492.37
1951_ 6 24,250.00 12,173.93
1952_ 1 4, 550. 00 2,565. 50

Rental units sold to others

Year No. Proceeds Gain

1950_ 1 $9,450. 00 $4,024.34
1951_ 33 221,950.00 62, 567.01
1952_ 52 433,900.00 218,184.32

Aiea Park and gymnasium sold to eity & county of Honolulu

Year Proceeds Gain

1951_ $60,000.00 $39,942.92
48. In determining the amount of gains shown above and in issue in this action, plaintiff included in its cost basis allocated portions of the cost of acquiring the land and houses, of development costs, and selling expenses. Plaintiff did not include in its cost basis for computing the gains shown above any portion of the salaries paid to its employees or' officers, the fee paid to its factor, interest charges, or real property taxes. Although the Internal Revenue Service took the position that the profit from the sale of such real estate was ordinary income rather than capital gains, the amount of gains as computed by plaintiff has not previously been contested by the Internal Revenue Service.
49. Sales of real estate similar in nature to the type of sales in 1950, 1951, and 1952, described in the preceding findings, continued to be made by plaintiff after 1952.
50. Plaintiff’s gross and net income from growing and milling sugar, from rentals and sale of its real properties in the years 1950, 1951, and 1952, as reported in its annual reports, were as follows:

*578
mo Gross income Net income

Sugar operations_ $10,039,822.18 $1, 069,065. 54
Rental income:
Employees-289, 309. 67 —97,117.17
Others-239,814. 30 135,170. 58
Other income_ —3, 844.33 —3, 844.33
Sales of real property. 600, 078. 70 267, 300.98

1951

Sugar operations-10,914,192.43 1, 851,967.26
Rental income:
Employees-256, 541.30 —143,303.09
Others_ 210,091. 45 107, 609. 74
Other income_ 865,849. 83 865, 849. 83
Sales of real property— 782, 567. 56 268, 818. 88

1952

Sugar operations-10,927,342.22 1,474, 369. 65
Rental income:
Employees-251,157.40 —183,224.19
Others-195, 071.16 81, 055. 86
Other income_ 18, 966.14 18,966.14
Sales of real property— 912, 935.00 454, 786.54
51. The plaintiff timely filed its Federal income tax returns for the calendar years 1950, 1951, and 1952 with the Collector of Internal Revenue, Hawaii. These returns reported income tax liabilities of $494,538.12 for 1950, $900,959.90 for 1951 and $622,138.65 for 1952. Plaintiff paid the income tax liabilities reported on said returns on or before the due dates of said liabilities.
52. By letter dated August 27,1954, the plaintiff received statutory notice from the Commissioner of Internal Revenue of deficiencies in income tax for the taxable years ended December 31, 1950, December 31, 1951, and December 31, 1952 as follows:
1950_$51,578. 59
1951_ 121, 368.32
1952_ 152,129.91
Total_ 325, 076. 82
These deficiencies resulted from the following determinations by the Commissioner, among others, for each of the respective years involved:
1950: (1) That profits in the amount of $267,300.98 realized by plaintiff from the sale of real properties, improved and unimproved, held in fee simple, resulted from plaintiff’s business of dealing in real estate and that, as a consequence, such profits were taxable as ordi *579 nary income; further, that the reporting of such income by plaintiff as capital gain was in error.
1951: (1) That profits in the amount of $256,644.95 realized by plaintiff from the sale of real properties were, as for the year 1950, taxable as ordinary income and not as capital gain, as reported by plaintiff.
1952: (1) That profits in the amount of $452,221.04 realized by plaintiff from the sale of real properties were, as for the years 1950 and 1951, taxable as ordinary income and not as capital gain, as reported by plaintiff.
In addition to the foregoing, the Commissioner made certain adjustments in each of the said calendar years both decreasing and increasing the net taxable income of plaintiff, all of which said adjustments have been conceded and are, therefore, not at issue in this action.
53. On November 9, 1954, plaintiff paid the proposed deficiencies in the total amount of $325,076.82, as determined by the Commissioner, together with interest thereon for the year 1950 in the amount of $11,309.83, for the year 1951 in the amount of $19,330.81, and for the year 1952 in the amount of $15,102.54, or a total in both deficiencies and interest in the amount of $370,820.
54. Plaintiff duly filed, pursuant to the applicable statutes and regulations, on March 15, 1955, a claim for refund of $126,839.24 in income taxes overpaid for the taxable year 1951, and on April 4, 1955, claims for refund of $55,011.03 and $167,804.11 in income taxes overpaid for the taxable years 1950 and 1952, respectively. In the claims for refund, plaintiff also claimed refunds of the amounts of interest paid on November 9,1954. All of the claims were filed with the District Director of Internal Revenue at Honolulu. The claims for refund for the respective calendar years were based on the following grounds:
1950: (1) That profits in the amount of $267,300.98 realized by plaintiff from the sale of real properties were capital gains and not ordinary income.
1951: (1) That profits in the amount of $268,818.88 realized by plaintiff from the sale of real properties were capital gains and not ordinary income. Said amount of $268,818.88 differs from the amount set forth in item (1) for the year 1951 above, representing the *580 determination by the Commissioner of such profits as were ordinary income, by the amount of $12,173.93. Said amount of $12,173.93 represented gain resulting from sales of unimproved real property to persons other than employees of plaintiff and was reported by plaintiff in its Federal income tax return for the taxable year 1951 as ordinary income. Said gain was reported by plaintiff as ordinary income in accordance with adjustments made by the examining agents of the Bureau of Internal Revenue upon examination of plaintiff’s Federal income tax returns for the taxable years 1948 and 1949, which adjustment was agreed to by plaintiff as a part of the agreement referred to hereafter in an attempt to avoid controversy and litigation. Such agreement provided for the treatment of gain from sales of unimproved real property to employees of plaintiff and of C & H as capital gain and profits from similar sales to others than such employees as ordinary income. The Commissioner of Internal Revenue, by his notice of deficiency of August 27,1954, repudiated said agreement, and plaintiff, therefore, claimed as capital gain in its claim for refund for the year 1951 the total amount of profits realized by plaintiff from the sale of its real properties.
(2) That plaintiff was entitled to a further reduction of net income for the taxable year 1951 by the allowance of a deduction in the amount of $4,124.02, representing additional rentals paid by plaintiff in 1954 on account of rentals due for the year 1951.
1952: (1) That profits in the amount of $454,786.54 realized by plaintiff from the sale of real properties were capital gains and not ordinary income. As for 1951, said amount of $454,786.54 differs from the amount set forth for the year 1952 above, by the amount of $2,565.50. Said amount of $2,565.50 represented gain resulting from sales of unimproved real property to persons other than employees of plaintiff and, for the reasons set forth in item (1) for the year 1951 in this paragraph, was reported by plaintiff in its Federal income tax return for the taxable year 1952 as ordinary income. Plaintiff, therefore, claimed as capital gain in its claim for refund for the year 1952 the total amount of profits realized by plaintiff from the sale of its real properties.
(2) That plaintiff was entitled to a further reduction of net income for the taxable year 1952 by the allowance of a deduction in the amount of $13,137.36, representing *581 additional rentals paid by plaintiff in 1954 on account of rentals due for the year 1952.
(3) That plaintiff was entitled to a further reduction of net income for the taxable year 1952 by the allowance of a deduction in the amount of $1,262.13, representing additional charges for deliveries of sugar paid by plaintiff in 1954 on account of charges due for the year 1952.
(4) That plaintiff was entitled for the year 1952 to a carryback of unused excess profits credit for the taxable year 1953 with the result that no excess profits tax was due for the taxable year 1952.
In its claims for refund, plaintiff accepted all other adjustments made by the Commissioner in each of the said calendar years decreasing or increasing the net taxable income of plaintiff.
55. Plaintiff was advised on August 10, 1956, by letter from the Chief of the Audit Division of the Office of the District Director of Internal Eevenue in Honolulu, that the report of the revenue agent reviewing plaintiff’s returns and claims for refund for the taxable years 1950, 1951, and 1952 had conceded plaintiff’s claims for refund in connection with item (2) for the taxable year 1951 as set forth above, and items (2), (3), and (4) for the year 1952, also as set forth above. Plaintiff thereupon received from the United States refunds for taxes paid in the amount of $2,330.15 for the taxable year 1951 and in the amount of $44,968.74 for the taxable year 1952. In addition, plaintiff received refunds for interest paid as a result of deficiency determinations by the Commissioner of Internal Eevenue, as set forth above, in the amounts of $371.13 for the year 1951 and $1,167.92 for the year 1952.
56. Plaintiff concedes error in its claim for refund for the taxable year 1952 in that the tax on capital gains in said claim was computed at a 25 percent rate rather than the statutory 26 percent rate in effect for the year 1952. The error results in a reduction of the amount of tax for which plaintiff claims a refund for the year 1952 by the sum of $4,590.87.
57. As a result of the foregoing, the amount of income taxes and interest now claimed by plaintiff to have been overpaid are as follows:

*582
Year Taos Interest Total

1950_ $55,011.03 $11,309.83 $66,320.86
1951_ 124,509.09 18,959.68 143,468.77
1952_ 118,244.50 13,934.62 132,179.12
Total_ 341, 968. 75
58. By letters dated September 26, 1956, and less than 2 years before the filing of this petition, the District Director of Internal Revenue in Honolulu gave notice by registered mail to plaintiff that its claim for refund for the year 1950 was disallowed in full and that its claims for refund for the years 1951 and 1952, to the extent not previously allowed, were also disallowed.
59. The trial was limited to the issues of law and fact relating to the right of plaintiff to recover. If it is held that plaintiff is entitled to recover, the determination of the amount of recovery is to be made pursuant to rule 38(c).
CON CLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Rule 38(c).
In accordance with the opinion of the court and on a memorandum report of the commissioner as to the amount due thereunder, it was ordered on September 21, 1962, that judgment for plaintiff be entered for $328,687.21, plus interest thereon as provided by law.

 26 U.S.C. (I.R.C. 1939) § 117(j) in effect provides that recognized gains on the sale of “real property used in the trade or business, held for more than 6 months, rvhich is not * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business” shall be given capital gains treatment. Since such property is not a capital asset, if the special provisions of § 117(3) are not met, the gains recognized are treated as ordinary income.

 See note 1, supra.